## Commonwealth *v.* Schmidt, Appellant.

Argued September 29, 1966. Before BELL, C.J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

434

 reargument refused December 27, 1966.

*Leo J. Kelly*, for appellant.

*Edwin J. Martin*, Assistant District Attorney, with him *David O'Hanesian*, Assistant District Attorney, and *Robert W. Duggan*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, November 22, 1966:

On February 13, 1965, the appellant, George Schmidt, while represented by court-appointed counsel, was convicted by a jury of murder in the first degree and punishment was fixed at life imprisonment. Post trial motions were overruled and sentence imposed as the jury directed. Schmidt filed this appeal.

Two assignments of error are asserted: (1) Incriminating statements given by Schmidt to the police were obtained in violation of his constitutional rights and, therefore, evidence thereof was erroneously admitted at trial; (2) The trial court erred in its charge to the jury.

The case history, as disclosed by the evidence, is briefly this: Schmidt with one Ken Baurle broke into the Caecilia-Mannerchor Club, located in a building in the north side section of Pittsburgh, about four

o'clock a.m. on June 10, 1964, pried open certain amusement devices therein and stole money therefrom. One Bill Thornton, with full knowledge of Schmidt's and Baurle's intent to burglarize the premises, accompanied them to the scene and waited outside in an automobile.

During the burglary, one Joseph Meier, a tenant in another portion of the building wherein the club was located, aroused by the noise, came to the club rooms to investigate. He was assaulted by Schmidt with a blunt instrument, suffered a broken jaw, a concussion of the brain and other injuries, which subsequently resulted in death.

An arrest warrant issued on June 15, 1964, charging Schmidt with suspicion of burglary and felony-murder. He was taken into police custody the same day. On June 19th, he made statements to the police, admitting his participation in the crime, one of which was tape recorded and another reduced to typewritten form.

After indictment and before trial, Schmidt filed a motion to suppress all evidence of his statements given to the police. A hearing was held thereon by the court, which it was agreed would also serve the purpose of an independent hearing to determine the voluntariness of the statements, as required by *Jackson v. Denno,* 378 U.S. 368 (1964). Extensive testimony was heard. Later the court filed a comprehensive opinion detailing its factual findings, and conclusion that the statements of Schmidt were freely and voluntarily given under circumstances devoid of any violation of constitutional rights. The motion to suppress was, therefore, denied. Subsequently, the evidence of Schmidt's statements to the police was admitted against him over objection at trial. The question of voluntari-

ness was left to the jury to resolve under careful instructions of the trial court.

It is admitted that Schmidt made the statements recorded on tape and those reduced to typewritten form, and that he signed the typewritten statement at the end thereof and initialed each page. It is also admitted that at the time Schmidt was without the assistance of counsel. However, other important facts as to the circumstances under which the statements were made and his treatment by the police during custody are in serious dispute. The Commonwealth's testimony on this facet of the case may be summarized as follows:

Schmidt was questioned intermittently by various investigating officers each day from June 15th to June 19th. No extensive periods of questioning occurred, and the interviews were conducted in a reasonable, if not friendly, manner, and without abuse, coercive or overbearing conduct. Before he was initially questioned, Schmidt was warned that he did not have to answer any questions and anything he said would be used against him in court. He was also informed that he had the right to be represented by an attorney of his own choice; to which he replied, he did not wish an attorney at that time.

When first questioned, Schmidt admitted having committed five other burglaries in the north side section of Pittsburgh in recent months, but denied any participation in the Mannerchor burglary. He persisted in this denial until June 19th. About 8:45 p.m. o'clock on that date, he was taken into the presence of Baurle and Thornton, both of whom had previously given formal written statements to the police admitting their part in the Mannerchor burglary, and implicating Schmidt as a co-participant and the assailant of Meier. Upon request, they orally repeated these admissions and accusations in the presence of Schmidt, which

statements were recorded on tape. Schmidt was then asked if he had anything to say. He replied that, "it happened like Kenny says. I hit the guy." Then, in answer to questions, he orally related the details of the crime, and his statements were likewise recorded on tape. At or near the end of this questioning he was advised that he didn't have to make a statement, and unless he consented to the use of his taped statement, it would be destroyed and not used against him. He replied that he wished the recording preserved.

Shortly thereafter he repeated in more complete fashion the occurrence involved. This statement was reduced to typewritten form and when completed, the writing was initialed on each page and signed at the end by Schmidt. Before this formal statement was taken, he was again warned of his right to remain silent and that anything he said would be used against him in court. At no time during the police custody or questioning did he request the assistance of counsel.

During the police custody period from June 15th to June 19th, no one asked to or visited Schmidt, except the pastor of a nearby Catholic church. This visit, in private, on the night of June 18th lasted about one hour.

The evidence submitted by Schmidt conflicted in many ways with that offered by the Commonwealth. In brief, it asserted in relevant part, that Schmidt was never advised of his right to the assistance of counsel during the police questioning; that such assistance was denied despite several requests for it; that he was constantly interrogated by the police during the entire custody period with only necessary interruptions consumed by sleeping and eating; that he was threatened and physically abused by several interrogating officers; and that his mother was denied the opportunity of seeing him during the custody period despite efforts to do so.

At the time of his arrest, Schmidt was seventeen years and two months old, having been born on April 2, 1947. He had a serious police history, and between the ages of ten and sixteen years spent most of his time in three separate juvenile correctional institutions.

After a careful consideration of all of the testimony in the record concerning the circumstances under which the incriminating statements of Schmidt were obtained, it is our studied conclusion that the question of the voluntariness thereof was for the jury to decide. Hence, the court below did not err in admitting the evidence thereof at trial or in refusing to suppress it. The evidence offered by Schmidt, indicating the statements resulted from abusive and overbearing police conduct, did not in itself render the evidence inadmissible. In view of the Commonwealth's testimony, which amply supported the conclusion that the statements were the free and voluntary act of Schmidt and obtained in the absence of physical and psychological coercive circumstances, it was for the jury to assess all of the testimony and determine the true facts. The verdict clearly indicates its findings. Moreover, two judges below who, in separate occasions, heard all of the testimony concerning the circumstances under which the statements were elicited arrived at the same conclusion, namely, that the statements were freely and voluntarily made. Our conclusion is to the same effect.

Nor are we persuaded that the absence of counsel during police questioning constituted a denial of "the assistance of counsel" in violation of the Sixth Amendment to the United States Constitution, and thus rendered inadmissible at trial evidence of the incriminating statements.[1]

---

[1] However, it was a significant fact to be considered in determining the voluntariness issue. See, *Davis v. North Carolina*, 384 U.S. 907 (1966), and *Johnson v. New Jersey*, 384 U.S. 719 (1966).

This case was tried subsequent to the announcement of the decision of the United States Supreme Court in *Escobedo v. Illinois*, 378 U.S. 478 (1964), but before the decision in *Miranda v. Arizona*, 384 U.S. 436 (1966). Hence, *Escobedo* controls, but the rules governing in-custody police interrogation announced in *Miranda* do not apply. See *Johnson v. New Jersey*, supra note 1.

Following the announcement of the decision in *Escobedo*, supra, the courts in many jurisdictions disagreed as to its full impact. See, *Commonwealth v. Negri*, 419 Pa. 117, 213 A. 2d 670 (1965), and cases cited therein. This Court, when first confronted with the problem, concluded that the *Escobedo* ruling was limited to its own facts, and, in particular, we decided that *Escobedo* controlled only "where a request for counsel is rejected and no warning is given of the right to remain silent." See, *Commonwealth ex rel. Linde v. Maroney*, 416 Pa. 331, 337, 206 A. 2d 288 (1965); *Commonwealth v. Patrick*, 416 Pa. 437, 206 A. 2d 295 (1965); *Commonwealth v. Coyle*, 415 Pa. 379, 203 A. 2d 782 (1964); and, *Commonwealth ex rel. Storch v. Maroney*, 416 Pa. 55, 204 A. 2d 263 (1964). In other words, we ruled that evidence of statements freely made by one accused of crime during police questioning in the absence of counsel was not constitutionally tainted and inadmissible at trial, unless the accused had *requested* and been refused the assistance of counsel during the questioning, *and* had not effectively been warned of his right to remain silent.

Subsequently, the United States Court of Appeals for the Third Circuit handed down decisions in the companion cases of *United States ex rel. Russo v. New Jersey*, and *United States ex rel. Bisignano v. New Jersey*, 351 F. 2d 429 (3d Cir. 1965). It was ruled therein, that no request by the accused is necessary

to impose upon the interrogating officer the duty to furnish the assistance of counsel during police interrogation in the absence of a warning to remain silent, or an intelligent and understanding waiver. In *Commonwealth v. Negri,* supra, for persuasive reasons spelled out therein, we decided to abandon our prior rulings on the pertinent question in *Linde, Patrick, Coyle* and *Storch,* supra, and follow the ruling of the Third Circuit in *Russo* and *Bisignano,* supra, "until some further word is spoken by the Supreme Court of the United States." See, *Commonwealth v. Negri,* supra, at 122.[2]

Subsequently in June 1966, the United States Supreme Court spoke further on the question under discussion in its decisions in *Miranda v. Arizona,* supra, and *Johnson v. New Jersey,* supra. A close study of the opinions in these cases compels the conclusion that our original interpretation of *Escobedo* was correct. In other words, under *Escobedo,* supra, an individual is not unconstitutionally deprived of the assistance of counsel during police questioning, unless he requested such assistance and was not effectively warned of his right to remain silent.[3] We now accept this final definitive ruling of the United States Supreme Court as controlling on the question.

In the present case, it was established by credible and competent evidence, which the lower court accepted as true, that Schmidt never requested the assistance of counsel during the period of police questioning. His testimony to the contrary was rejected below as unworthy of belief. Additionally, it was established that before any questioning commenced he was warned

---

[2] The trial herein occurred before our decision in *Negri* was announced.

[3] This, of course, is not true in a case involving police interrogation governed by *Miranda v. Arizona,* supra. However, as noted before, *Miranda* does not apply here.

that he did not have to answer any questions. Also, that this warning, in words of like import, was repeated on two additional occasions during the questioning period. In this connection, it is significant to note that even Schmidt admitted in his own testimony that such a warning was given before he signed the type-written statement, and that in the forepart thereof was included the following question and answer: "Q.: Before going any further I am now going to advise you of your constitutional rights in which you either have the right to give or refuse to give this statement which will be used either for you or against you at the time of your trial, which do you wish to do? A. [By Schmidt] You mean what do I want to do, I want to give it." Under the circumstances, the absence of counsel during the questioning did not per se render evidence of the incriminating statements constitutionally inadmissible.

In the final assignment of error, Schmidt contends that the trial court erred in its charge, because the jury was at least inferentially deprived of the opportunity of returning any verdict of guilty other than that of murder in the first degree. It is unquestionably true that "in a trial on a murder indictment the jury has the *exclusive* right to fix the degree of guilt and may not be deprived of this right, even though the only evidence in the case establishes that the killing was committed in the perpetration of a felony:" *Commonwealth v. Meas*, 415 Pa. 41, 45, 202 A. 2d 74 (1964). However, our reading of the charge in the instant case discloses no violation of this legal principle. In more than one instance, the trial court clearly and unequivocally told the jury that any one of four verdicts was possible under the evidence, namely, first degree murder, second degree murder, voluntary manslaughter, or not guilty; and, that it was for the jury to determine which verdict was proper.

Judgment affirmed.

442

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I do not agree with the majority's views on the current status of *Commonwealth v. Negri,* 419 Pa. 117, 213 A. 2d 670 (1965). Nor do I believe that the defendant's confession should have been admitted.

I

Since the opinion of the Supreme Court of the United States in *Johnson v. New Jersey,* 384 U.S. 719, 86 S. Ct. 1772 (1966), limiting *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758 (1964), to its narrowest reading and holding that *Escobedo* need not be applied to trials prior to June 22, 1964, the date of that decision, there has been considerable speculation as to the effect of *Johnson* upon our holding in *Commonwealth v. Negri,* 419 Pa. 117, 213 A. 2d 670 (1965). Complicating this situation is the fact that as of June 13, 1966, the date of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), all the rights granted by *Negri* are unquestionably incorporated in the law of this Commonwealth; indeed in light of *Miranda,* the rights of the accused during in-custody interrogation are even greater than those specified in *Negri.*

Since the trial in the instant case occurred in February 1965, seven months prior to *Negri,* and since the evidence fails to support the defendant's claim that he requested counsel, the majority's discussion of *Negri* is not necessary. See *Commonwealth ex rel. Wilkes v. Maroney,* 423 Pa. 113, 116, 222 A. 2d 856, 858-59 (1966); *Commonwealth v. Cheeks,* 423 Pa. 67, 223 A. 2d 291 (1966). Frankly, I suspect that all the speculation on this point is academic and would not find it necessary to express my views except for the fact that the majority today goes out of its way to overrule *Negri,* retrospectively no less.[1]

_____

[1] We are, of course, only free to apply our solution in those cases tried prior to June 13, 1966, now pending on direct appeal,

It must be remembered that neither *Escobedo* nor *Miranda* amended the fourteenth amendment of the Constitution of the United States: "We start here, as we did in *Escobedo,* with the premise that our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings." *Miranda v. Arizona,* 384 U.S. at 442. However, for pragmatic and understandable reasons the Supreme Court of the United States has held that "the Constitution neither prohibits nor requires retrospective" application of resurrected constitutional rights. In determining retrospectivity or non-retrospectivity the Court must "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S. Ct. 1731, 1737, 1738 (1965). Whether a particular right is denied retrospective application, however, *"in no way turns on the value of the constitutional guarantee involved." Johnson v. New Jersey,* 728 U.S. at 728 (1966) (Emphasis supplied).

A study of *Johnson* leaves no doubt that *Miranda* and *Escobedo* were not applied retrospectively because of the Court's fear that to do so would seriously disrupt the administration of criminal justice: "Law enforcement agencies fairly relied on these prior cases [of the Supreme Court of the United States], now no longer binding, in obtaining incriminating statements during the intervening years preceding Escobedo and Miranda." *Johnson v. New Jersey,* 384 U.S.

and in an occasional habeas corpus petition. Moreover, I trust the police have been complying with *Negri* since the date of that decision.

[2] But see *Commonwealth v. Negri,* 419 Pa. 117, 131, 213 A. 2d 670, 677 (1965) (concurring and dissenting opinion) ; Comment, Linkletter, Shott, and the Retroactivity Problem in Escobedo, 64 Mich. L. Rev. 832 (1966).

444

731.[2] In *Commonwealth v. Negri,* supra, we held that *Escobedo* could not be limited to those cases where the defendant had made an actual request for counsel. Thus, at least from September 29, 1965, the date of *Negri,* law enforcement agencies in Pennsylvania were on notice as to the defendant's in-custody rights.[3] Thereafter there was no excuse for them not to fully comply with these rules nor is there any reason for us to admit a confession obtained in derogation thereof.

In *Linkletter v. Walker,* supra, the Supreme Court of the United States held that *Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684 (1961) (exclusionary rule of fourth amendment incorporated into fourteenth amendment), was not to be applied retrospectively. As the opinion freely admits this was a departure from the Court's prior practice, as all previous constitutional decisions had, sub silentio, been given retrospective effect. Id. at 628, 85 S. Ct. at 1737. Also, because *Mapp* had, again sub silentio, been applied to non-final decisions, the impact of *Linkletter* was necessarily limited to those cases which had become final[4] prior to June 19, 1961, the date of *Mapp.* Id. at 622, 85 S. Ct. at 1734. In *Johnson,* however, the Court held that the date of trial, rather than the date of finality, was the crucial one for determining the applicability of *Escobedo* or *Miranda.*

In any criminal trial after June 13, 1966, a confession, even if obtained five or more years ago, cannot

---

[3] *Negri* was decided after the Third Circuit had held that *Escobedo* could not be limited to those situations where the suspect made an actual request for counsel. *United States ex rel. Russo v. New Jersey,* 351 F. 2d 429 (3d Cir. 1965), decided May 20, 1965, rehearing denied Oct. 13, 1965. One could argue that May 20 should be the applicable date, but I believe that *Negri,* not *Russo,* finally determined the guidelines in this Commonwealth for the period preceding *Miranda.* Cf. *State v. Coleman,* 46 N.J. 30-38, 214 A. 2d 393, 400-04 (1965).

[4] For the Court's definition of finality, see *Linkletter v. Walker,* 381 U.S. 618, 622 n.5, 85 S. Ct. 1731, 1734 n.5 (1965).

be admitted unless the law enforcement officials adhered to the guidelines set forth at length in *Miranda.* However, for a trial prior to that date we may utilize any rule we desire unless the holding of *Escobedo* has been violated. *Johnson,* 86 S. Ct. at 1781. Since the essential rationale of these decisions seems to be deterrence of improper police practices I can see no sensible reason for making the trial date the determinative one.[5] See *Linkletter v. Walker,* at 637, 85 S. Ct. at 1742. In my view the crucial date ought to be the date the confession was elicited and I would judge its admissibility according to the standards judicially announced at that time.

In summary, I would be willing to modify *Negri* to this extent: Any incriminating statement elicited before September 29, 1965, which was in conformity with *Escobedo,* would be admissible in any trial prior to June 13, 1966. However, any incriminating statement taken after *Negri* was decided would be inadmissible unless the warnings set forth therein were given.

## II

My own review of the record convinces me that the defendant-appellant's confession was improperly admitted. In addition, I believe that the majority's approach is inconsistent with that mandated by the opinions of the Supreme Court of the United States.

For the reasons discussed in Part I, I agree that the admissibility of Schmidt's statements must be judged under the concept of voluntariness as that term has been defined in the coerced confession cases arising under the fourteenth amendment of the Constitu-

---

[5] While the Court applied the new rules to *Miranda* and the three defendants in the companion cases, by denying certiorari on the other direct appeals pending on June 13, 1966, it refused to apply them to numerous defendants similarly situated.

tion of the United States. See, e.g., *Haynes v. Washington*, 373 U.S. 503, 83 S. Ct. 1336 (1963); *Culombe v. Connecticut*, 367 U.S. 568, 81 S. Ct. 1860 (1961); *Rogers v. Richmond*, 365 U.S. 534, 81 S. Ct. 735 (1961); *Malinski v. New York*, 324 U.S. 401, 65 S. Ct. 781 (1945); *Commonwealth ex rel. Gaito v. Maroney*, 422 Pa. 171, 220 A. 2d 628 (1966); *Commonwealth v. Graham*, 408 Pa. 155, 182 A. 2d 727 (1962); *Commonwealth v. Bryant*, 367 Pa. 135, 79 A. 2d 193, cert. denied, 341 U.S. 954, 71 S. Ct. 1007 (1951). While neither *Escobedo* nor *Miranda* involved coerced confessions, we may not ignore the impact of these decisions upon the legal definition of voluntariness in this area. *Davis v. North Carolina*, 384 U. S. 737, 86 S. Ct. 1761 (1966).

Originally coerced or involuntary confessions were excluded from state trials under the due process clause of the fourteenth amendment because of a fear that they were apt to be untrustworthy. See *Brown v. Mississippi*, 297 U.S. 278, 56 S. Ct. 461 (1936). However, shortly after *Brown*, the Supreme Court of the United States began to abandon the trustworthy test in favor of one in which the central focus was on whether the confession resulted from "the accused's 'free choice to admit, to deny, or to refuse to answer.' [Citations omitted.] The shift reflects recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. *Rogers v. Richmond*, 365 U.S. 534, 541 [1961], 81 S. Ct. 735, 739." *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S. Ct. 1489, 1493 (1964); see generally id. at 4-8, 84 S. Ct. at 1491-94. As a result, "it is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . and even though

there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno,* 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964).

The responsibility for insuring the vitality of these fundamental principles lies with the appellate courts. In *Haynes v. Washington,* 373 U.S. 503, 515-16, 83 S. Ct. 1336, 1344 (1963), and cases cited therein, the Supreme Court of the United States explained its obligation not to rubber stamp the findings of the court below, even if that court is the highest court of a state. As state appellate judges our responsibility can be no less, and like the Supreme Court of the United States "we cannot be precluded by the verdict of a jury from determining whether the circumstances under which the confession was made were such that its admission in evidence amounts to a denial of due process." *Ward v. Texas,* 316 U.S. 547, 550, 62 S. Ct. 1139, 1141 (1942), quoted in *Haynes v. Washington,* supra at 516, 83 S. Ct. at 1344. In my view the majority abdicates the essence of our responsibility in this area when it approves the introduction of the defendant's statements on the basis of its "studied conclusion [of the manner in which the statements were obtained] that the question of the voluntariness . . . was for the jury to decide."

I do not dispute the proposition that the jury's findings, especially since they are in accord with the views of the hearing judge, are entitled to some weight. Nevertheless, there is a strong possibility that a jury, notwithstanding proper instructions, may not understand the policies behind excluding involuntary, but true, confessions and may thus utilize an involuntary confession in reaching its conclusion as to the defendant's ultimate guilt. See *Jackson v. Denno,* 378 U.S. 368, 386-89, 84 S. Ct. 1774, 1786-87 (1964). This danger renders the practice, previously utilized in this Commonwealth, of submitting all challenged confessions to the jury, without a prior independent deter-

mination of their voluntariness by a judge, unconstitutional. *Jackson v. Denno,* supra; *Commonwealth ex rel. Corbin v. Myers,* 419 Pa. 139, 213 A. 2d 356 (1965). Even though a separate hearing was held in this case, these same reasons preclude us from placing too much weight on the jury's conclusion that the confession was voluntary. Cf. *Commonwealth ex rel. Shaffer v. Cavell,* 423 Pa. 425, 223 A. 2d 730 (1966).

My review of the undisputed evidence in this case precludes me from giving any weight to the majority's conclusion, upon which it seems to rely heavily, that Schmidt effectively waived his right to the assistance of counsel. The only evidence that Schmidt waived his right to counsel is contained in the testimony of Detective Tercsak who stated that on the day of the defendant's arrest he warned him of his constitutional right to remain silent and of his right to be represented by counsel. Significantly, while Detective Tercsak recorded on a "police action sheet" that he had informed the defendant of these rights, he did not record the fact that the defendant responded by saying that he did not want counsel at that time. If Tercsak's purpose was to make a record of his action in case of a future challenge, as it evidently was, I find it inconceivable that he did not also record the denial.[6] Moreover, the interrogation took place prior to the decision in *Escobedo* and it was admitted by the police at the hearing that at the time of the instant interrogation they did not as a general rule inform suspects of their right to representation. In response to a question as to why he made an exception in this case, Tercsak replied "because they were juveniles." I fail to see how Tercsak, or this Court, can conclude that while

---

[6] There was considerable dispute as to the accuracy of these police action sheets. On this point the testimony of Detective Tercsak and his fellow officers was in conflict.

the defendant was so young that he needed a special warning, nonetheless, he was mature enough to make an intelligent and knowing decision to decline the assistance of counsel.[7] "[C]ourts should indulge every reasonable presumption against waiver of fundamental constitutional rights and not presume acquiescence in their loss." *Commonwealth ex rel. McCray v. Rundle,* 415 Pa. 65, 69, 202 A. 2d 303, 305 (1964); accord, *Commonwealth ex rel. O'Lock v. Rundle,* 415 Pa. 515, 204 A. 2d 439 (1964); *Carnley v. Cochran,* 369 U.S. 506, 82 S. Ct. 884 (1962); *Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019 (1938).

The record also discloses that, except for one-half hour visit with a priest, the defendant was held incommunicado from the time of his arrest, 10:30 A.M., Monday, June 15, 1964, until after his confession Friday evening. During this period he was subjected to intensive interrogation by eight teams of interrogators consisting of two men each. While there is some dispute as to the exact number of hours spent in interrogation, it appears to have been in the neighborhood of forty. Defendant's mother was denied permission to see him although she was in the police station and made a specific request. Moreover, it is undisputed that Schmidt knew about his mother's presence, although there is some dispute as to whether the police threatened to detain her if he did not co-operate. In

[7] One of the basic impetuses behind the decision in *Miranda* was to prevent the determination of whether the defendant waived a basic constitutional right from degenerating into a swearing contest between the accused and his interrogators. Cf. *Mallory v. United States,* 354 U.S. 449, 77 S. Ct. 1356 (1957); *McNabb v. United States,* 318 U.S. 332, 63 S. Ct. 608 (1943). Although the issue of an effective waiver may still arise, it ought to arise with less frequency. In any event the state has, as it always has had, a heavy burden to shoulder if it desires to prove a waiver. *Miranda v. Arizona,* 86 S. Ct. at 1628.

these circumstances the mere fact that he was warned of his right to silence is not persuasive. *Haley v. Ohio,* 332 U.S. 596, 68 S. Ct. 302 (1948) ; see *Davis v. North Carolina,* 384 U.S. 737, 86 S. Ct. 1761 (1966).

During this interrogation the defendant consistently denied his participation in the burglary resulting in the murder, for which he now stands convicted, until after his accomplices had repeated in his presence their confessions implicating him. If it were clear that this, and not police pressures, were the precipitating force in eliciting the confession, it would be admissible. But it is impossible to determine at this date to what extent the incommunicado interrogation had taken its toll. If at the time of the confession Schmidt's will was "overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Rogers v. Richmond, 365 U.S. 534. The line of distinction is that at which governing self-direction is lost and compulsion, of *whatever nature or however infused, propels or helps to propel* the confession." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 1879 (1961) (FRANKFURTER, J.) (Emphasis supplied). Thus, although I have doubts and difficulties, I believe the admission of this confession violates due process. See *Haley v. Ohio,* 332 U.S. 596, 602, 68 S. Ct. 302, 305 (1948) (separate opinion of FRANKFURTER, J.).

I dissent.