Commonwealth *v.* Bishop, Appellant.

176

Argued November 18, 1966. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Edwin B. Barnett,* for appellant.

*Joseph M. Smith,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, April 18, 1967:

On August 5, 1963, Charles Bishop was convicted by a jury of murder in the first degree and punishment was fixed at life imprisonment. Post trial motions were overruled and sentence imposed in accordance with the jury's verdict. This appeal followed.

At trial an incriminating typewritten statement (confession) given by Bishop to the police was admitted in evidence over objection. The sole question presented for determination is whether or not this evidence was secured under circumstances which violated Bishop's constitutional rights and its trial use constituted a denial of due process of law.

The pertinent facts established by the Commonwealth's evidence may be summarized as follows: On Sunday night, March 31, 1963, the dead body of sixteen-year old Frances Burrell was found in the trunk of an abandoned automobile on a public street in Philadelphia. The clothes were in disarray and private portions of the body exposed. A medical examination indicated she had been dead at least two days and death was caused by strangulation. Male sperm was found in the vagina.

Police investigation disclosed that she departed from her home alive on Thursday night, March 28th, about eight o'clock and never returned. Also, that for a few days immediately prior thereto, she had received several phone calls from someone nicknamed "Peanut," and these calls terminated after her disappearance.

After checking out several individuals, the police learned on April 5, 1963, that a young man (Charles Bishop) who lived with his aunt, Mrs. Bertha Santos, on Catherine Street, was sometimes referred to as "Peanut." On the morning of April 6th about ten-thirty o'clock, three policemen visited the home of Mrs. Santos and informed her that they were investigating her nephew because he was called "Peanut." No other details were disclosed. They told Bishop they wanted him to go to police headquarters for questioning. He readily assented. Mrs. Santos was invited to accompany Charles but declined.

Bishop was taken by the officers, via automobile, to headquarters for the Special Investigation Police Squad, where he was questioned intermittently for about two and one-half hours. During this period he was told, "You can tell us what you want, it is up to you." No further advice as to his right to remain silent was given.

During this questioning, Bishop made several conflicting statements concerning his whereabouts on the night of Thursday, March 28th, the date of Miss Burrell's disappearance. At first he also denied knowing the victim, but later admitted this was untrue. However, he steadfastly denied any involvement in her death, or having phoned her on any occasion prior thereto.

Shortly after two-thirty o'clock, Bishop was transferred, via police "wagon" to Homicide Detective Headquarters. There he was met and questioned by four officers. He was immediately informed that they had information he was with Miss Burrell on the night she was murdered and asked him if he wanted to tell them about her death. About ten minutes later, he "admitted participation" in the crime.[1] The questioning then pro-

---

[1] What he specifically said is not in the record.

ceeded, with intermissions, until about five-twenty o'clock in the afternoon. During this period, he was not warned of his right to remain silent or that anything he said would be used against him in court. However, he was treated kindly and without abuse or intimidation.

Finally about five-forty o'clock, the recording of the challenged statement began. Immediately before he was warned, for the first time, that anything he said would be used against him in court. No further warnings or advice were given. The statement, in answer and question form, was typewritten and when finished, about seven-thirty o'clock, read to and signed by Bishop.[2] Shortly thereafter he was escorted back to the home of Mrs. Santos, and she was informed he was "to be arrested" for the crime. Bishop then identified for the officers the clothes he wore on the night of the killing. A subsequent examination thereof by a laboratory technician disclosed scrapings thereon which matched material of the same nature found in the abandoned automobile. Stains of blood on the clothing were found to be the same type as that of the victim. One of Bishop's fingerprints was also found in the automobile.

On April 8, 1963, Bishop was arraigned before the Juvenile Division of the County Court of Philadelphia. On May 6, 1963, the case was certified to the Court of Oyer and Terminer of Philadelphia County and thereafter an indictment for murder returned by the grand jury.

Appellant first contends, that the confession was obtained in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and,

___

[2] Therein he related having consensual sexual relations with the victim in the back seat of the automobile involved; having an argument; strangling her and pushing the body through the back seat into the trunk area.

therefore, should have been excluded at trial, because he was not furnished with the assistance of counsel at the time. In *Commonwealth v. Schmidt*, 423 Pa. 432, 224 A. 2d 625 (1966), this issue was fully discussed and determined adversely to appellant's position. See also, *Commonwealth v. Jefferson*, 423 Pa. 541, 226 A. 2d 765 (1967). It need not detain us further.

Appellant next urges, that the confession was not voluntary and, therefore, obtained in violation of the Fifth and Fourteenth Amendments to the United States Constitution. The trial jury and the court below in an independent (Jackson) hearing found to the contrary.

Since the instant trial terminated months before the announcement of the decisions in *Escobedo v. Illinois*, 378 U.S. 478 (1964), and *Miranda v. Arizona*, 384 U.S. 436 (1966), these rulings do not control: *Johnson v. New Jersey*, 384 U.S. 719 (1966). The fact that Bishop was not given the in-custody warnings these decisions require during the police questioning did not, in itself, render the confession inadmissible. They were, however, important factors to be considered in determining if Bishop's statements were made of his own free will. See *Davis v. North Carolina*, 384 U.S. 737 (1966), and *Commonwealth ex rel. Mumford v. Cavell*, 423 Pa. 280, 223 A. 2d 852 (1966). The voluntariness question has to be determined in the light of all the existing circumstances. See *Commonwealth v. Cheeks*, 423 Pa. 67, 223 A. 2d 291 (1966). While Bishop was only sixteen years of age (he was evidently still no "babe in the woods") and without friend or counsel at the time of the questioning, and, admittedly, not warned of his right to remain silent, the voluntariness question, under all of the facts established by the record, was in our opinion for the jury to resolve. Cf. *Commonwealth v. Schmidt*, supra.

The final attack on the validity and admissibility of the confession poses a difficult question and presents the truly significant thrust of this appeal.

Bishop was taken into custody without a warrant and none was issued prior to the time the confession was obtained. It is established beyond argument that a warrantless arrest is not lawful, unless there is probable cause therefor. See *Ker v. California,* 374 U.S. 23 (1963). Probable cause means that "the facts and circumstances within their [arresting officers] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief" that the suspect had committed a crime: *Carroll v. United States,* 267 U.S. 132, 162 (1925). See also *Brinegar v. United States,* 338 U.S. 160 (1949). It has been argued that no "arrest" occurred in this case since Bishop went along willingly with the police to headquarters. Assuming arguendo, that no coercive restraint existed in the beginning, Bishop was certainly under arrest when he was transferred to the Homicide Detective Headquarters. Any other contention is ludicrous. This is especially so in view of the uncontradicted testimony in the record that he was handcuffed during the transfer. Whether or not sufficient cause existed to justify an arrest at that time (in view of Bishop's contradictory statements) need not be reached. For, assuming an illegal arrest occurred, it is still our view that, under all the circumstances, the evidentiary use of the confession was not constitutionally proscribed.

Until 1963, the great weight of authority, both state and federal, was to the effect that evidence of confessions or admissions elicited from an illegally arrested person was not constitutionally tainted. See Kamisar, Illegal Searches or Seizures and Contemporaneous Incriminating Statements: A Dialogue on a Neglected Area of Criminal Procedure, U. Ill. L.F. 78, at 81 n. 16

(1961). However, in *Wong Sun v. United States,* 371 U.S. 471 (1963), the court ruled that under certain circumstances (at the very least, evidence secured at the very point of an illegal arrest in the turmoil of an unlawful invasion) verbal evidence following an unauthorized arrest must be excluded as the "fruit" of police illegality. While some early state court decisions[3] seem to imply that *Wong Sun,* supra, is based on the Court's supervisory power over the federal courts, there seems no question since the memorandum decision in *Traub v. Connecticut,* 374 U.S. 493 (1963), that the ruling is a corollary of *Mapp v. Ohio,* 367 U. S. 643 (1961), and applies to state court trials as well. See The Supreme Court and Restrictions on Police Interrogation, 25 Ohio St. L.J. 449 (1964).

However, as we read *Wong Sun,* supra, it does not necessarily follow that all confessions or admissions secured from an illegally arrested person are per se inadmissible as trial evidence.[4] It appears to us that for such to be so there must be a causal connection[5] between the illegal arrest and the subsequent confession or admission,[6] and that in *Wong Sun* the Supreme

---

[3] See, e.g., *Prescoe v. State,* 231 Md. 486, 493-4, 191 A. 2d 226, at 231 (1963).

[4] See *Wong Sun v. United States,* 371 U.S. 471, at 487-88: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police." (Emphasis added.)

[5] Mere "but-for" causation is not sufficient to establish the causative relationship necessary to taint the post-illegal arrest verbal evidence. See n. 4, supra. See also *Collins v. Beto,* 348 F. 2d 823, 835 (5th Cir. 1965) (Concurring opinion, FRIENDLY, J.); *Rogers v. United States,* 330 F. 2d 535, 541, 542 (5th Cir. 1964) (per WISDOM, J.), cert. denied, 379 U.S. 916 (1964).

[6] Even if such a causal connection exists, highly respected authority has voiced the opinion that the police may through the exercise of certain precautions "purge the taint" of the illegal arrest before the inculpatory statement is obtained. See Opinion of Chief Judge TUTTLE in *Collins v. Beto,* 348 F. 2d 823, 828 (5th Cir. 1965).

Court articulated at least two instances wherein a post-illegal arrest confession is admissible: (1) If the confession is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 U.S. at 486; or, (2) If the "connection between the arrest and the statement had 'become so attenuated as to dissipate the taint'", 371 U.S. at 491.[7]

Hence, it is our conclusion that if the connection between the arrest and the confession is shown to be so vague or tenuous "as to dissipate the taint" or "sufficiently an act of free will," the confession is admissible, despite the illegality of the arrest. By "sufficiently an act of free will," we mean that not only was the confession truly voluntary,[8] but also free of any element of coerciveness due to the unlawful arrest. The burden of proof, of course, is upon the Commonwealth.

It is our further conclusion that the evidence in the instant case was sufficient to establish that the chal-

---

[7] In discussing the problem in *Commonwealth ex rel. Craig v. Maroney*, 348 F. 2d 22, at 29, the United States Court of Appeals for the Third Circuit stated, "There are two factors which seem to be of major significance in determining the relationship between an illegal arrest and, as here, the subsequent confession: (a) the proximity of an initial illegal custodial act to the procurement of the confession; and (b) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest."

*Quaere*: factor (a). In *Collins v. Beto*, supra, n. 6, at 828, Judge TUTTLE, speaking for himself, emphasized that the mere passage of time cannot serve to dissipate the taint, otherwise ". . . the police would be free simply to keep a suspect 'on ice' for a day or two before beginning the interrogation." But see *Rogers v. United States*, supra, n. 5, at 541; Kamisar, Book Reviews, 76 Harv. L. Rev. 1502, at 1509 n. 27 (1963).

[8] That is to say, the confession must first meet whatever admissibility test is then required of a normal confession, in this instance the "voluntariness" test.

lenged confession was both truly voluntary and not the fruit of the illegal detention. Hence, any illegality in the arrest did not infect the subsequent confession. See and compare, *Rogers v. United States,* 330 F. 2d 535 (5th Cir. 1964), cert. denied, 379 U.S. 916 (1964); *United States v. Close,* 349 F. 2d 841, 851 (4th Cir. 1965), cert. denied, 382 U.S. 922 (1965); *Hollingsworth v. United States,* 321 F. 2d 342 (10th Cir. 1963); and *United States v. Burke,* 215 F. Supp. 508 (D.C. Mass. 1963), cert. denied, 379 U.S. 849 (1964).

Judgment affirmed.