George SCHMIDT, C8126, Appellant,

v.

Lowell D. HEWITT, Supt.

No. 77–1284.

United States Court of Appeals,
Third Circuit.

Argued Nov. 28, 1977.

Decided Feb. 24, 1978.

Michael R. Kelly, Pittsburgh, Pa., for appellant.

Robert C. Coville, Dist. Atty., Robert L. Eberhardt and Robert Z. Zunich, Asst. Dist. Attys., Pittsburgh, Pa., for appellee.

Before GIBBONS and VAN DUSEN, Circuit Judges, and FISHER *, District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

George Schmidt, a state prisoner serving a sentence of life imprisonment for first-degree murder, appeals from the denial of his application for a writ of habeas corpus. He contends: (1) that he was deprived of due process of law when, while still a juvenile, he was committed for trial as an adult, without ever being brought before juvenile court; and (2) that he was convicted on the basis of a confession inadmissible under the United States Constitution. Without conducting an evidentiary hearing of its own, the district court rejected Schmidt's contentions, relying on the state court record.

In this litigation, the state concedes that Schmidt has exhausted his state remedies on each of these issues, and that they are therefore properly before this court. We conclude that the district court properly rejected the first ground for habeas corpus relief on the basis of the state court record. As to the second ground, however, we conclude that that part of the state court record in which the admissibility of Schmidt's confession was adjudicated pursuant to *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), does not fairly support the state court decision. The district court should, therefore, have held an evidentiary hearing before deciding on Schmidt's application.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 10, 1964, about 4:00 A.M. two persons broke into the Caecilia-Mannerchor Club in Pittsburgh, Pennsylvania. While they were rifling the club's coin-operated amusement devices, they were surprised by Joseph Meier, a tenant in the same building. Meier was struck with a blunt instrument and received injuries from which he died.

On the morning of June 15, 1964, George Schmidt, then seventeen years old, was taken into custody under a warrant charging him with suspicion of burglary and of felony murder. The Commonwealth of Pennsylvania has subsequently conceded that no affidavit, establishing probable cause, justified the issuance of the warrant. Accord-

---

* Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting by designation.

ing to the Commonwealth, however, no warrant was required if the officer in fact had probable cause to make the arrest. The state court record is devoid of any evidence showing the existence of such cause.

On the evening of June 19, 1964, George Schmidt made the incriminating statement, the admissibility of which is now in dispute. From the time of his arrest until his confession, Schmidt had been held incommunicado, except for a short visit with a priest. He had first been transported to No. 1 Police Station, where he had been received by Detective Tercsak at approximately 10:30 A.M. on June 15. Interrogation had commenced at 11:00 A.M. and—carried on by eight teams of two interrogators each—had continued for forty hours over five days. Throughout this time Schmidt had consistently denied his participation in the burglary and resulting murder. Finally, at 8:45 P.M. on June 19 he was brought into the presence of two alleged accomplices, Kenneth Baurle and William Thornton, who repeated in his presence their earlier confessions implicating him. After hearing their incriminating statements, Schmidt acknowledged that he was in the Caecilia-Mannerchor Club during the burglary and that he struck Meier. Up to this time Schmidt was without counsel.

In September, 1964, George Schmidt was indicted for first-degree murder. At no time was he brought before juvenile court. Instead, a coroner's inquest was held at which he was represented by court-appointed counsel. The coroner's jury found probable cause to bind him over to the grand jury, which subsequently indicted him.

After the indictment, Schmidt's attorney moved to suppress all evidence of his statement to the police. Thereafter, an evidentiary hearing, as required by *Jackson v. Denno,* was held. The court, making findings of fact, denied the suppression motion. As will appear, the record and findings in that hearing are critical to the disposition of this appeal.

At his trial in February, 1965, Schmidt was convicted. Post-trial motions were overruled, and on direct appeal the Supreme Court of Pennsylvania affirmed the conviction over a vigorous dissent. *Commonwealth v. Schmidt,* 423 Pa. 432, 224 A.2d 625 (1966). Justice Roberts in dissent argued that Schmidt's confession had been improperly admitted. Thereafter, Schmidt proceeded under Pennsylvania's Post Conviction Hearing Act, 19 P.S. §§ 1180–1 *et seq.,* alleging five errors which had not been disposed of on direct appeal.[1] After a hearing on this petition the Pennsylvania trial court refused relief. On January 19, 1973, the Pennsylvania Supreme Court affirmed. *Commonwealth v. Schmidt,* 452 Pa. 185, 229 A.2d 254 (1973). Among the five errors asserted in that petition was the contention that the confession was the fruit of an illegal arrest and therefore inadmissible under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This argument was rejected on the ground that there had been a deliberate choice not to raise it in the pretrial *Jackson v. Denno* hearing. Also rejected was an argument based on the fact that Schmidt had been deprived of a hearing in the juvenile court on the question of whether he should have been treated as a juvenile offender.

Having exhausted state court remedies, Schmidt filed on April 1, 1976, a federal habeas corpus petition, which resulted in the order appealed from.

## II. THE ABSENCE OF JUVENILE COURT PROCEEDINGS

At the time of Schmidt's arrest and trial, the Juvenile Court of Allegheny County

1. Schmidt alleged the following errors:
   (1) that his confession was the fruit of an illegal arrest;
   (2) that evidence of unrelated crimes had been introduced at trial;
   (3) that his fourth amendment rights had been violated;
   (4) that he had never been given a hearing in juvenile court; and
   (5) that a tacit admission had been introduced against him at trial, in violation of his fifth amendment rights.

had jurisdiction over "all crimes . . . whatsoever . . . wherein the person charged is a child under eighteen years of age." 11 P.S. § 269–202(f).[2] Schmidt never appeared before that court. The Commonwealth argues that the Court of Oyer and Terminer has discretion under 11 P.S. § 269–413 to retain jurisdiction over juveniles between sixteen and eighteen charged with murder. The difficulty with this argument is that the state court record contains no evidence of a hearing on the question of transfer. If transfer to juvenile court could have conferred on Schmidt any substantial benefit, then a transfer hearing would be constitutionally required. *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

The Supreme Court of Pennsylvania did not, however, rest its rejection of Schmidt's juvenile claim on the discretion, exercised without a hearing, of the Court of Oyer and Terminer. Instead, construing the Juvenile Court Law of Allegheny County consistently with the general Juvenile Court Law, 11 P.S. §§ 243 *et seq.,* it held that the sole responsibility of a juvenile court in a murder case is to determine whether the Commonwealth has made out a *prima facie* case. If it is determined that the Commonwealth has borne its burden, then the defendant must be held for indictment and trial in the regular criminal courts. In Schmidt's case the same determination of probable cause was made in a coroner's inquest, at which he was represented by counsel. *Commonwealth v. Schmidt,* 452 Pa. at 203, 299 A.2d at 264. Thus, all he lost by the failure of the Court of Oyer and Terminer to transfer his case was the determination of probable cause by a juvenile court judge, rather than by a coroner's jury.

■ We are bound by the Pennsylvania Supreme Court's interpretation of the Commonwealth's statutes. If the role of a juvenile court judge in a murder case is so circumscribed, then we must agree that transfer to the juvenile court would have afforded Schmidt no significant benefit. We must therefore agree that the absence

of a hearing on transfer did him no prejudice. It is, nonetheless, a circumstance, among many others, bearing upon the length of his interrogation and therefore, ultimately, upon the voluntariness of his confession.

## III. THE DETERMINATION OF VOLUNTARINESS

The *Jackson v. Denno* hearing in Schmidt's case was held after the decision in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but before the decisions in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and in *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Judge Graff conducted a hearing and made findings of fact before denying the motion to suppress. Reviewing the admissibility of Schmidt's confession on direct appeal, the Supreme Court of Pennsylvania divided sharply, both in approach and in result. The majority, joining in an opinion by Justice Eagen, declared:

After a careful consideration of all of the testimony in the record concerning the circumstances under which the incriminating statements of Schmidt were obtained, it is our studied conclusion that the question of the voluntariness thereof was for the jury to decide. Hence, the court below did not err in admitting the evidence thereof at trial or in refusing to suppress it. The evidence offered by Schmidt, indicating the statements resulted from abusive and overborneing [sic] police conduct, did not in itself render the evidence inadmissible. In view of the Commonwealth's testimony, which amply supported the conclusion that the statements were the free and voluntary act of Schmidt and obtained in the absence of physical and psychological coercive circumstances, it was for the jury to assess all of the testimony and determine the true facts. The verdict clearly indicates its findings. Moreover, two judges below who, on separate occasions, heard

2. Repealed by 11 P.S. § 50–337 (1972).

all of the testimony concerning the circumstances under which the statements were elicited arrived at the same conclusion, namely, that the statements were freely and voluntarily made. Our conclusion is to the same effect.

423 Pa. at 438, 224 A.2d at 628. Thus in its review, the majority placed primary emphasis on the jury's determination, made only passing reference to the *Jackson v. Denno* hearing, and, to the extent revealed by the opinion, made no analysis of the testimony at the suppression hearing or of the resulting findings by the trial judge.

Justice Roberts in dissent argued that *Jackson v. Denno* precluded the majority from placing primary reliance on the jury's finding. He made an independent review of the suppression hearing record and concluded that in the totality of the circumstances Schmidt's confession was involuntary as a matter of law. He found that Schmidt did not, as required by *Escobedo v. Illinois,* effectively waive the assistance of counsel prior to this confession and that, at the time he made it, his will had been overborne.

■ We agree with Justice Roberts that the Supreme Court majority overemphasized the jury verdict. We also agree with him that the appropriate focus of appellate review is the suppression hearing and Judge Graff's findings of fact. That, too, must be the focus of our habeas corpus review.

### A. *The* Escobedo *Contention*

■ The state trial court held that there had been no *Escobedo* violation. Several of the court's findings of fact underlay that conclusion. The court distinguished *Escobedo* in part because "[t]he interrogation of the defendants was clearly of an investigatory character of an unsolved crime." *Escobedo,* of course, applies only "when the process shifts from investigatory to accusatory." 378 U.S. at 492, 84 S.Ct. at 1766. The record before us, however, establishes beyond question that the process had shifted from investigatory to accusatory four days before Schmidt confessed. He had been taken into custody on a warrant

charging him with suspicion of felony murder. To the extent that the quoted finding suggests that Schmidt was not the focus of the investigation or that the interrogation was not intended to elicit a confession, it is not fairly supported by the record.

■ The court also found, however, that when Schmidt was first brought to No. 1 Police Station, he was advised that he could have counsel if he so desired, but he failed to ask for it. Justice Roberts, the only justice of the Pennsylvania Supreme Court who made a detailed analysis of the testimony at the suppression hearing, was justifiably skeptical about that finding. He wrote:

My review of the undisputed evidence in this case precludes me from giving any weight to the majority's conclusion, upon which it seems to rely heavily, that Schmidt effectively waived his right to the assistance of counsel. The only evidence that Schmidt waived his right to counsel is contained in the testimony of Detective Tercsak who stated that on the day of the defendant's arrest he warned him of his constitutional right to remain silent and of his right to be represented by counsel. Significantly, while Detective Tercsak recorded on a "police action sheet" that he had informed the defendant of these rights, he did not record the fact that the defendant responded by saying that he did not want counsel at that time. If Tercsak's purpose was to make a record of his action in case of a future challenge, as it evidently was, I find it inconceivable that he did not also record the denial.[6] Moreover, the interrogation

[6] There was considerable dispute as to the accuracy of these police action sheets. On this point the testimony of Detective Tercsak and his fellow officers was in conflict.

took place prior to the decision in *Escobedo* and it was admitted by the police at the hearing that at the time of the instant interrogation they did not as a general rule inform suspects of their right to representation. In response to a question as to why he made an exception in this case, Tercsak replied "because they were juveniles." I fail to see how Tercsak, or

this Court, can conclude that while the defendant was so young that he needed a special warning, nonetheless, he was mature enough to make an intelligent and knowing decision to decline the assistance of counsel.

423 Pa. at 448–49, 224 A.2d at 633. Justice Roberts's description of the evidence is accurate. In reviewing the trial court's factual determinations, however, he may have more latitude than does a federal judge ruling on a habeas corpus petition. The standard of review under 28 U.S.C. § 2254(d) is limited, and the burden rests on the petitioner "to establish by convincing evidence that the factual determination by the State court was erroneous." The trial judge in the suppression hearing found Detective Tercsak's testimony to be credible and all conflicting testimony not credible. Thus for *Escobedo* purposes, we must take it as established that Schmidt was told, on his arrival at No. 1 Police Station, that he had a right to counsel. We must also take it as established that he waived that right prior to interrogation. *Escobedo* alone would not therefore be authority for the grant of habeas corpus relief.

### B. *The Voluntariness Contention*

The trial judge also found that Schmidt's confession was voluntary. On that issue Justice Roberts summarized the evidence as follows:

> The record also discloses that, except for one-half hour visit with a priest, the defendant was held incommunicado from the time of his arrest, 10:30 A.M., Monday, June 15, 1964, until after his confession Friday evening. During this period he was subjected to intensive interrogation by eight teams of interrogators consisting of two men each. While there is some dispute as to the exact number of hours spent in interrogation, it appears to have been in the neighborhood of forty. Defendant's mother was denied permission to see him although she was in the police station and made a specific request. Moreover, it is undisputed that Schmidt knew about his mother's presence, although there is some dispute as to wheth-

er the police threatened to detain her if he did not cooperate.    .    .    .

> During this interrogation the defendant consistently denied his participation in the burglary, resulting in the murder, for which he now stands convicted, until after his accomplices had repeated in his presence their confessions implicating him.

423 Pa. at 449–50, 224 A.2d at 634. That summary is consistent with the trial court's findings of fact, to the extent that such findings were made.

In addition, the trial judge made other findings. He found that on several nights during the interrogation of Schmidt and the two other suspects, he and one suspect were moved to other police stations in Pittsburgh. He also found that "[t]he small amount of physical abuse testified to by Schmidt is not worthy of belief." Finally, there is this finding:

> 5. Lie Detector tests were given to the boys upon various occasions, and upon June 16 Thornton stated to the officer operating the machine that he had heard Baurle and Schmidt discussing the burglary and murder and indicating a part therein. On this test Thornton was advised by the operator that he was not telling the truth concerning himself.

Thornton was one of the three suspects. It was his statement coupled with that of Baurle which on June 19 at 8:45 P.M. produced Schmidt's confession. The trial court obviously attached significance to the lie detector test in which Thornton implicated Schmidt and Baurle.

There is, however, testimony concerning other lie detector tests—testimony which is not referred to in the trial court's findings of fact. Charles McInerney of the Pittsburgh and Allegheny Crime Laboratory conducted a polygraph examination of Schmidt. He testified:

> Q. What were the results of your examination with respect to the examination of the subject Schmidt when the relevant questions were asked in this case?

A. Well, the relevant questions that were asked of Schmidt were as follows: Number 1: Do you know for sure who burglarized the Caecilia Mannechor on June 10th? Answer: No. Question Number 2: Did you help in any way to burglarize the Caecilia Mannechor Club on June 10th? Answer: No. Question Number 3: Were you present when the watchman was hit at the Caecilia Mannechor Club? Answer: No. Question Number 4: Did you hit the watchman at the Caecilia Mannechor Club? Answer: No. There were no significant emotional disturbances indicative of deception on this subject's polygraph records on any of the above listed relevant questions.

Q. Then an interpolation of that in layman's language would indicate that this subject was telling the truth when he was denying any knowledge in this offense?

A. It is my opinion based on the polygraph recording he was telling the truth on these questions.

Transcript Suppression Hearing 305. Although the trial judge made no reference to this segment of McInerney's testimony, he relied heavily upon another segment—McInerney's testimony about Thornton's polygraph test—in determining the voluntariness of Schmidt's confession. Moreover, the reference to the latter segment is highly selective. For example, in his polygraph examination Thornton identified Kenneth Baurle, not Schmidt, as the assailant of the decedent, and McInerney indicated that this part of Thornton's statement was apparently truthful. On the question of what Thornton had overheard, McInerney testified as follows:

Q. When was the first time in connection with this matter you had examined Thornton?

A. William Thornton was first examined on Tuesday, June 16th, 1964.

Q. And did you ask him the same questions at that time?

A. No, I didn't.

Q. What were the relevant questions that you did ask him at that time?

A. At that time I asked him these relevant questions: Number 1: Did Sonny and Kenny say that they robbed the Mannechor Club? And he answered: "No" to that question. But following that test he said that he wasn't sure. This was part of the examination because the examination consisted of more than one test.

Q. All right?

A. In the middle of the examination he explained that there was some doubt in his mind there. So I rephrased the question as follows: Did you understand from Sonny and Kenny that they had robbed the Mannechor Club? In other words he was saying they didn't tell him directly they had done it but gathered from the total substance of some conversation he heard they had—from a total substance of the conversation he felt they had done it.

By the Court:

Q. What was his answer?

A. His answer was, yes.

Transcript Suppression Hearing 306–7. This testimony hardly supports the trial court's unequivocal statement that "Thornton stated to the officer operating the machine that he had heard Baurle and Schmidt discussing the burglary and murder and indicating a part therein."

A second polygraph of Thornton was taken a day later. About that one McInerney testified:

A. Thornton said that Kenny [Baurle] told him that his fingerprints were all over the Mannechor Club, that he was going to burn his fingers, and that he would refuse to take a lie detector test. Then Thornton was examined instrumentally, that is using the polygraph, and the following relevant questions were asked, Number 1: Besides what you told about do you have any other reasons for suspecting Kenny or Sonny? And the answer: No. Question Number 2: Were you present at the Mannechor Club about a week ago? Answer: No. Question Number 3: Were you in Sonny's car outside of the Mannechor Club? Answer:

No. Number 4: Are you hiding any information about the watchman being beaten up? Answer: No. And on those questions there were no indications of deception.

Mr. Flaherty: No indication of deception.

By Mr. Strauss:

Q. Your interpolation of that was he was telling the truth when he was denying any knowledge of participation.

A. Yes.

By Mr. O'Hanesian:

Q. That's after he had already told you what he did on the 16th and 17th?

A. Yes.

Transcript Suppression Hearing 309–10. The answers to these four questions are inconsistent with the statement by Thornton which on June 19, 1964, helped to produce Schmidt's confession. The identification of Baurle as the assailant is inconsistent with Schmidt's confession. Schmidt's own polygraph examination conducted during the course of the suppression hearing indicated that his confession was false. Certainly, falsity of a confession would be one factor indicating involuntariness. But the trial judge simply ignored Schmidt's polygraph examination. And he dealt with Thornton's examination in a selective and misleading manner.

■ The fact that during the course of the interrogation the police officers resorted to deception in an effort to secure a confession is certainly a factor bearing on voluntariness. Officer Nee admitted that he and others told Schmidt that Baurle and Thornton had confessed—before they in fact did. Transcript Suppression Hearing 207–235. Although it was unsuccessful, this tactic was part of an overall scheme of coercion and pressure. The trial court made no reference to Nee's testimony.

During his five-day interrogation Schmidt never met with his mother despite her presence in the same police station for an afternoon and evening. Mrs. Schmidt testified that while she was there she begged to see her son. There is some variance between her version of events on June 15, 1964, and that of one of the police officers, but there is no dispute that she was there for many hours and never saw her son. The trial court made no determination as to which version was correct. The only reference to Mrs. Schmidt is the sentence: "Schmidt's mother was more addicted to drink than to exercising supervision over her child." That may be, but such a finding is no substitute for a reasoned consideration of her long vigil at the police station as one factor in the coercion surrounding Schmidt and bearing on the voluntariness of his confession. No reference was made to Schmidt's testimony that he was told by the police officers that they would keep his mother locked up until he signed a statement.

■ Our examination of the 554 pages of testimony and 42 pages of exhibits in the suppression hearing, and of the findings of fact based thereon, leaves us with the firm conviction that the findings are not adequately supported by the record. Significant facts strongly suggesting that the confession may have been the product of coercion were simply ignored by the factfinder. We conclude, therefore, that an evidentiary hearing on the admissibility of Schmidt's confession should have been held by the district court before it ruled on the habeas corpus application. 28 U.S.C. § 2254(d)(8).

## IV.  CONCLUSION

The judgment appealed from will be reversed, and the case remanded to the district court for an evidentiary hearing on the admissibility of Schmidt's confession.