**Application of Theodore James SANTOS, Jr.**

v.

**Edgar B. BAYLEY, Assistant District Attorney, Cumberland County, Pennsylvania.**

**Application of Paul RICHARD, a/k/a Richard Anthony Harris**

v.

**Edgar B. BAYLEY, Assistant District Attorney, Cumberland County, Pennsylvania.**

Civ. A. Nos. 75–943, 75–994.

United States District Court,
M. D. Pennsylvania.

Sept. 16, 1975.

Richard C. Snelbaker, Martson & Snelbaker, Mechanicsburg, Pa., for petitioner Santos.

Arthur L. Goldberg, Goldberg, Evans & Katzman, Harrisburg, Pa., for petitioner Richard.

Harold Sheely, Dist. Atty. of Cumberland County, Edgar B. Bayley, First Asst. Dist. Atty. of Cumberland County, Carlisle, Pa., for respondent.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

This case is before the court on petitioners' applications for writs of habeas corpus. Petitioners Theodore James Santos, Jr. and Paul Richard, a/k/a Richard Anthony Harris, were tried together and ultimately convicted of unlawful possession with intent to deliver a Schedule I controlled substance; to wit, 225 pounds of marijuana, in violation of Section 13(a)(30) of the Controlled Substance, Drug Device and Cosmetic Act of 1972, No. 64, P.L. 233, 35 P.S. 780–113(a)(30), before Judge Weidner in the Court of Common Pleas of Cumberland County, Pennsylvania. They made a timely but unsuccessful motion for suppression of evidence. A finding of guilt was made on May 21, 1973, and Santos was sentenced to a term of imprisonment of not less than one nor more than three years, while Harris was sentenced to imprisonment of two to five years. Petitioners' motions in arrest of judgment and for a new trial were denied, and on appeal the Superior Court of Pennsylvania affirmed the conviction. Allocatur was denied by the Pennsylvania Supreme Court in a per curiam order entered on July 14, 1975. Thereafter, they filed a petition in this court for habeas corpus.

The facts are these: On November 16, 1972, defendant Santos and his companion, defendant Richard, were travelling east on the Pennsylvania Turnpike in a 1966 International Travelall van owned by defendant Santos, and registered in the State of California. State Trooper Max Seiler, in a patrol car, sighted the van heading east and followed the vehicle, while awaiting the arrival of assistance, in response to a radio broadcast from the State Police Communications Center at Highspire to the effect that a white International Travelall, California registration SZH 992, with two white male occupants, had entered the Turnpike at Breezewood carrying a large quantity of marijuana at approximately 1:30 P.M. Trooper Robert Geary appeared on the scene, and with one patrol car in front of the van and one patrol car in the rear, the troopers signalled the driver of the van, defendant Santos, to pull over. The troopers then emerged from their patrol cars, armed with a .30 calibre carbine and a .12 gauge pump shotgun, and instructed the occupants of the van to get out and "spreadeagle" against the van. Trooper Seiler conducted a patdown search while Trooper Geary covered the defendants with his carbine. When the patdown search revealed that the defendants were unarmed the troopers returned their weapons to their cars.

While Trooper Seiler conducted a radio check on defendant Santos' vehicle registration and the drivers' licenses of both defendants, Trooper Geary gave the defendants their Miranda warnings and ascertained that they understood their rights. When questioned by the defendants as to why they were stopped, Trooper Geary informed them that the police had reason to believe that they were transporting a large quantity of marijuana. He then asked defendants if they would permit the troopers to search their van, advising them as follows:

"I want you to keep this in mind, that if you give me permission and if we would find anything in the vehicle it would be used against you. I want you to understand this. . . . You do not have to give me permission to search the vehicle."

When Trooper Seiler returned to the van (there were no irregularities in appellants' registration or licenses), he administered the Miranda warnings a sec-

ond time and ascertained that they were understood. When asked again by the defendants why they had been stopped, the troopers explained that they had reasonable cause to believe that the defendants were transporting a large quantity of marijuana.

The troopers then explained to the defendants that they (the police) did not have the right to search the car. Trooper Seiler further explained that a search could only be conducted in one of two ways. He stated that the first way to search the vehicle would be by obtaining a search warrant from a district magistrate; that under this procedure the troopers would be required to swear out a complaint for a search warrant stating probable cause to believe contraband was in the vehicle. It was further stated to the defendants that the district magistrate would only issue a search warrant if he determined that the complaint in fact stated sufficient probable cause to believe the marijuana was present in the Travelall van. Trooper Seiler stated that the second way to search the vehicle would be with the consent of the defendants. At no time up until this point did the troopers threaten to arrest the defendants, to impound their vehicle or to obtain a search warrant. In addition, it was further stated that the defendants had an absolute right to refuse to permit the search. Defendants then agreed to allow the police to search the vehicle and signed a handwritten consent granting the troopers permission to search the van.

With the assistance of defendant Santos, the troopers searched the van. Defendant Santos went to the front seat of the van, removed a box from under the seat, and extracted a set of keys which he used to open the tailgate. The inside of the van contained suitcases, clothing bags, a cooler, a mattress and blankets. When Santos asked, "Where would you like to start?" Trooper Seiler selected one of the suitcases and Santos thereupon unlocked the combination lock on the suitcase and began removing the clothing inside. Trooper Seiler noted that among the piles of clothing there was a tightly rolled newspaper, and upon unrolling it, discovered a quantity of marijuana. Undaunted, Santos asked where the troopers would next like to look, and Seiler selected a second suitcase, whereupon Santos remarked, "Here's where you make sergeant." Santos unlocked the combination lock and opened the suitcase, which was filled with marijuana packaged in large bundles. Defendants were then handcuffed and taken to the local State Police barracks. A subsequent search revealed other large caches of marijuana, similarly packaged, including 49 kilos concealed in the spare tire compartment. In all, defendants had been transporting more than 225 pounds of the contraband. Thereafter, the defendants signed a form indicating that they did not wish to make any further statements and that they wished to see attorneys.

The defendants were subsequently transported by the troopers to the district magistrate's office where formal charges were made. While enroute, Trooper Seiler initiated a conversation with Trooper Geary, both of whom were in the front seat, regarding a recent television program dealing with the smuggling of marijuana into the United States from Mexico. Upon overhearing this conversation, Richard, who was sitting with Santos in the back seat, stated, "If you're ever in California and want marijuana, see me." At this point Trooper Geary turned to Santos and asked him if the marijuana came from Mexico, to which Santos answered, "It's not mine." Richard volunteered at this time, "It's mine." Trooper Geary thereafter continued the questioning of the petitioners in order to obtain more information. Subsequently, at the county prison, defendant Santos stated that he was assisting defendant Richard in transporting the marijuana from California to the east for a fee of one thousand dollars.

■ Petitioners have exhausted their state remedies. They are not required to

make use of the provisions of the Post Conviction Hearing Act [1] or raise issues again which were determined on direct appeal. Recent cases have consistently held that a state prisoner's thorough exercise of direct appellate remedies is a sufficient exhaustion of state remedies for federal habeas corpus purposes. United States ex rel. *Schultz v. Brierly*, 449 F.2d 1286, 1287 (3d Cir. 1971); *Osborn v. Russell*, 434 F.2d 650, 651 (3d Cir. 1970). The Supreme Court made it clear in *Brown v. Allen*, 344 U.S. 443, 447, 73 S.Ct. 397, 97 L.Ed. 469 (1953), that the exhaustion doctrine is not intended to give the states more than one full chance. *See also,* United States ex rel. *Geisler v. Walters*, 510 F.2d 887 (3d Cir. 1975).

Petitioners rely on the recent holding of the Supreme Court in the case of *Brown v. Illinois*, 422 U.S. 490, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), for their contention that a writ of habeas corpus should be issued discharging petitioners from custody on the grounds that the marijuana in the present case was seized as a result of a search illegal under the Fourth Amendment and was therefore inadmissible under the exclusionary rule announced in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In *Wong Sun* the Supreme Court clarified the nature of the Fourth Amendment protection from unreasonable searches and seizures by extending the scope of the application of the exclusionary rule to verbal statements as well as to the more traditional seizures of tangible "papers and effects." In addition to the exceptions to the exclusionary rule established by the court in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939),[2] the *Wong Sun* Court recognized that not all evidence is "fruit of the poisonous tree" simply because it could not have come to light but for the illegal actions of the police. Specifically, the Supreme Court held that the application of the exclusionary rule was dependent on " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint' . . . ." *Wong Sun, supra,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed. 2d at 488. Accordingly, where a statement is the product of an intervening independent act of a free will and such is "sufficiently an act of free will to purge the primary taint of the unlawful invasion" (Id., at 486, 83 S.Ct. at 416); *see*, *Brown v. Illinois, supra,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d at 426, then the statements and other evidence obtained after an illegal arrest or search are admissible as evidence.

In *Brown v. Illinois*, the Supreme Court elaborated on the principle it first announced in *Wong Sun*. The facts of the *Brown* case are briefly as follows. The defendant was arrested outside his apartment without probable cause and without a warrant during an investigation of a murder which had occurred a week earlier. After having been driven to the stationhouse, defendant was taken to the interrogation room, given his Miranda warnings and questioned concerning the murder under investigation. Subsequently, defendant made an in-custody inculpatory statement admitting his participation in the murder. After accompanying the police while they locat-

---

1. 1966, Jan. 25, P.L. 1580 § 2, 19 P.S. §§ 1180–2.

2. In Silverthorne the Supreme Court held that the exclusionary rule has no application where the government learns of the evidence "from an independent source." 215 U.S., at 392, 40 S.Ct. 182. The Supreme Court delineated a second exception to the exclusionary rule in *Nardone v. United States, supra,* for cases in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint."

ed and arrested his accomplice, defendant was again placed in the interrogation room and administered his Miranda rights, whereupon he gave a second statement providing a factual account of the murder substantially in accord with his first statement but containing factual inaccuracies with respect to his personal background. The Supreme Court of Illinois recognized the unlawfulness of the defendant's arrest, but held that the giving of Miranda warnings *in and of themselves* served to break the causal connection between the illegal arrest and the giving of any statements, and to vitiate the taint of the illegal arrest, so that any subsequent statement, even one induced by the continuing effects of unconstitutional custody, was admissible so long as, in the traditional sense, it was voluntary and not coerced in violation of the Fifth and Fourteenth Amendments. The Supreme Court granted certiorari because of its concern about the implication of its holding in *Wong Sun* to the facts of the *Brown* case.

After reviewing the facts and the holding of *Wong Sun*, the Court, in *Brown*, held that Miranda warnings, alone and per se, do not ensure that the act is sufficiently a product of free will to break the causal connection between the illegality of the arrest and any subsequent confessions. The Miranda warnings are only a procedural safeguard employed to protect *Fifth* Amendment rights, specifically the Fifth Amendment guarantee against coerced self-incrimination, from the compulsion inherent in custodial surroundings. The Court further stated:

"The exclusionary rule, however, when utilized to effectuate the *Fourth* Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. . . (emphasis supplied)

"Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' . . ." 422 U.S. at 601, 95 S.Ct. at 2260, 45 L.Ed.2d at 426.

■ For the purpose of determining whether a confession is the product of a free will under *Wong Sun,* the Court held that the voluntariness of the statement is only a threshold requirement. While the Miranda warnings are an important factor in determining whether the confession is obtained by exploitation of an illegal arrest, all of the facts of each case must be considered. Other relevant factors include the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.

In *Commonwealth v. Bishop,* 425 Pa. 175, 182, 228 A.2d 661 (1967) the Pennsylvania Supreme Court explained the *Wong Sun* test this way: "[I]f the connection between the arrest and the confession is shown to be so vague or tenuous 'as to dissipate the taint' *or* 'sufficiently an act of free will,' the confession is admissible, despite the illegality of the arrest. By 'sufficiently an act of free will,' we mean that not only was the confession truly voluntary, *but also free* of any element of coerciveness due to the unlawful arrest. . . ." *Id.,* at 183, 228 A.2d at 666. (emphasis in original) *See also, Bertrand Appeal,* 451 Pa. 381, 389, 303 A.2d 486 (1973) quoting from *Bishop* with approval. The mere perfunctory recital of Miranda warnings is

not a sufficient intervening act of free will to break the chain of events leading directly from the illegal arrest to the confession. *Id.*, at 390–91, 303 A.2d 486.

The federal circuit court cases similarly have held that the mere showing of the voluntariness of the confession is insufficient to purge the taint of a prior illegal arrest.[3] The circuit courts have pointed to other factors which are of major significance in determining the relationship between an illegal arrest and a subsequent confession: (a) the proximity of an initial illegal custodial act to the procurement of the confession[4]; (b) the intervention of other circumstances subsequent to an illegal arrest which provides a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest[5]; (c) the wantonness of the arrest and flagrancy of the official police conduct[6]; and (d) the existence of a significant change in circumstances, such as affording the suspect an effective opportunity to obtain the assistance of counsel.[7]

Clearly, the holdings in the aforementioned cases are not materially different from the reasoning of the Supreme Court in the recent decision of *Brown v. Illinois.* The standard for evaluating the taint of post-illegal arrest verbal evidence was clearly established at the time of the trial of the present case, both in the federal courts and in the local Pennsylvania state courts.

The Cumberland County Court found, beyond the mere voluntariness of the consent rendered, sufficient relevant factors to properly render a decision that the consent was free of any element of coerciveness due to the unlawful arrest. The court outlined the standard it adopted, indicating that the illegality of an arrest should not vitiate a subsequent consensual search if the totality of the circumstances shows a total absence of coercion, either express or implied, and that the original taint has dissipated. See, Commonwealth ex rel. *Craig v. Maroney, supra,* and *Commonwealth v. Bishop, supra.*

The Common Pleas Court noted that the troopers twice administered the Miranda warnings and ascertained that the defendants understood them. Likewise, it was explained to them several times that the consent form need not be signed. Under the authority of *United States v. Menke,* 468 F.2d 20 (3d Cir. 1972), this showing is sufficient to establish the voluntariness of the defendants' consent to search. In *Menke,* following the arrest of the defendant and the administration of Miranda warnings by the arresting officers, the defendant allegedly volunteered that a parcel of contraband being sought by the enforcement officers was in the trunk of his automobile. Defendant thereafter expressed his willingness to get it if the agent wanted it, explaining that it would be easier for him to get it because the trunk had a tricky lock. The Third Circuit Court reaffirmed its holding in *Government of Virgin Islands v. Berne,* 412 F.2d 1055 (3d Cir. 1969), *cert. denied,* 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87, *reh. denied,* 396 U.S. 937, 90 S.Ct. 261, 24 L.Ed.2d 239 (1969), stating that where a defendant is given the detailed *Miranda* warnings, even in the absence of ad-

---

3. *See, e.g. Collins v. Beto,* 348 F.2d 823, 828 (5th Cir. 1965); *Commonwealth ex rel. Craig v. Maroney,* 348 F.2d 22, 29 (3d Cir. 1965).

4. *Commonwealth ex rel. Craig v. Maroney, supra; Commonwealth v. Bishop,* 425 Pa. 175, 183 n. 7, 228 A.2d 661 (1967). In *Collins v. Beto, supra,* Judge Tuttle recognized the relevance of this factor but also emphasized that the mere passage of time could not serve to dissipate the taint, otherwise

" . . . the police would be free simply to keep a suspect 'on ice' for a day or two before beginning an interrogation. . . ." (348 F.2d, at 828)

5. *Commonwealth ex rel. Craig v. Maroney, supra; Commonwealth v. Bishop, supra.*

6. *Collins v. Beto supra.* (Concurring opinion, Friendly, J.)

7. *Collins v. Beto, supra.*

vising the defendant that he was not legally obligated to open the trunk of his automobile in the absence of a search warrant covering the automobile, and thereafter ". . . voluntarily submits to interrogation and freely offers information on the existence and location of specifically identified evidence, and further agrees to surrender the evidence to the police, fully cognizant of his right to remain silent and fully aware that the information he provides may be used against him, the seizure of such evidence does not violate the Fourth Amendment. In such a case, the accused, by his words and actions, has abandoned any privacy or security in the location of the evidence. . . . " *Id.*, at 1062 *Menke, supra,* at 24.

■ The Common Pleas Court, having determined the voluntariness of the consent, continued its discussion of the case with an analysis of further factors pertaining to the nature of the defendants' consent. The court found that, contrary to the contentions of counsel for the defendants, the defendants' consent was not a mere acquiescence to a show of force of the troopers, and we agree. The United States Supreme Court has distinguished the informal and unstructured conditions of consent searches, a part of the standard investigatory techniques of law enforcement agencies, which normally occur on the highway or in a person's home or office, from the coercive atmosphere of custodial or stationhouse interrogation. *Schneckloth v. Bustamonte,* 412 U.S. 218, 232, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The initial brief display of arms by the troopers at the berm of the Pennsylvania Turnpike was not so inherently coercive as to preclude an independent, intervening voluntary consent on the part of the defendants.

Further, while the holdings in *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) and *United States v. Ricci,* 313 F.Supp. 31 (E.D.

Pa.1970) establish that cooperation of defendants in the face of law enforcement officers possessed with seemingly valid search warrants is not the product of a free will, untainted by the invalid warrants, these decisions are limited by their facts to searches under color of warrants where presumably probable cause has already been established before an independent judicial officer and the occupant accordingly has no right to resist the search. The facts in the present case rebut any further contention that the troopers conducted the search of the van under color of their office or the law which they personify, without any justification in law for such intrusion.[8] Having explained to the defendants that they (the defendants) were stopped because the troopers had "reasonable cause to believe," or "reason to believe," that their vehicle contained a large amount of marijuana, which in fact was true based on the police bulletin received over the radio, the troopers further explained that they (the police) did not have the right to search the van unless they procured a search warrant from a district magistrate based on sufficient probable cause, or unless the defendants consented to such a search. Clearly, where a person has been warned of his right to refuse the search in addition to his Miranda rights, it is inconceivable that his election to consent to the search and deliver the evidence up to the police was anything less than a free and voluntary abandonment of his security in this otherwise constitutionally protected area. *Menke v. United States, supra,* at 25. As the Common Pleas Court noted, "Although it is argued that consent to the inevitable cannot be free of coercion (citation omitted), it is clear that the instant case is within the distinction to that rule, that irrespective of apparent inevitability, a consent can be voluntarily given if there is evidence of knowledge that a right is surrendered, of which the consenting party is fully apprised.

---

8. *See, e.g., Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921) ;

*Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

*Commonwealth v. Mamon,* 449 Pa. 249, 254 [297 A.2d 471] (1972)."

The Supreme Court concluded, in *Schneckloth v. Bustamonte, supra,* at 235–46, that a consensual search does not entail a waiver since it is in no way involved in protection of the ascertainment of truth or of the fairness of a criminal trial. As a consequence the government is not required to demonstrate a knowing or intelligent waiver, or an intentional relinquishment or abandonment of a known right or privilege, nor is the court required to indulge in every reasonable presumption against waiver or fundamental constitutional rights. *See, Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 610, 82 L.Ed. 1461 (1938).

The Common Pleas Court's decision also dismissed any allegation that the actions of the troopers constituted flagrant official police misconduct. In finding that the entire sequence of events demonstrated that the defendants were fully informed of their right to require a search warrant, and at liberty to exercise that right without interference, the court noted (1) that the defendants demanded to know why they had been stopped before they would acknowledge their Miranda rights, and (2) that both defendants willingly signed the consent form even after repeated warnings that they could refuse to sign. The court concluded that this conduct militated against a conclusion that the defendants were submissive to the troopers' suggestions or "show of force." The court further noted that defendant Santos actively assisted in the search of the vehicle; such affirmative assistance in a warrantless search also implies a consent voluntarily given. *Menke v. United States, supra; United States ex rel. Anderson v. Rundle,* 274 F.Supp. 364, 371 (E.D.Pa.1967), *aff'd,* 393 F.2d 635 (3d Cir. 1968). Here, too, we agree with the Court of Common Pleas.

■ Counsel for the defendants contend that the consent was tainted by the prior wanton and illegal arrest; that the police told the defendants they had reasonable cause for the arrest, when, in fact, they did not. While the arrest of the defendants at the time that the troopers frisked them was not based on valid probable cause and was therefore illegal, the stopping of the van and the subsequent search were justified under the circumstances and did not amount to flagrant or wanton misconduct. Upon a review of the holdings in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Common Pleas Court properly held that the troopers were acting lawfully when they stopped the defendants' vehicle to conduct an investigation of the information they had received over the police radio. As we stated by the Supreme Court in *Adams:*

"In Terry this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest.' The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an immediate response . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (citations omitted) 407 U.S. at 145, 92 S.Ct. at 1923, 32 L.Ed. at 616–17.

The troopers maintained that they had "reasonable cause to believe" that there was a large quantity of marijuana in

the van as justification for stopping the vehicle. This was in fact the case. The troopers could reasonably have believed that there was marijuana being transported in the van on the basis of the information received over the radio. At no time did the officers claim that they had probable cause to either arrest the defendants or to search the van. Nor do the Supreme Court cases establishing the rights of defendants mandate an extended explanation on what constitutes probable cause to search, or on the difference between "reasonable cause to believe" an investigatory stop is warranted, and "probable cause" to search.

 The subsequent search of the van conducted by the troopers was certainly not gross misconduct, irrespective of the defendants' consent to search. Recent Supreme Court opinions have clearly recognized a necessary difference between circumstances justifying a warrantless search of an automobile and a home or office. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Warrantless searches and seizures of contraband goods are more liberally allowed under the Fourth Amendment where they are in the course of transportation, and easily removed from the jurisdiction or destroyed. Such a seizure is legal if the seizing officer has reasonable or probable cause for believing that the vehicle which he stops and seizes has contraband therein which is being illegally transported. *Id.*, at 156, 45 S.Ct. 280. The search of an automobile on probable cause proceeds on a theory wholly different from that justifying the search incident to an arrest; the right to search and the validity of the seizure are not dependent on the right to arrest, but rather they are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law. *Chambers, supra,* at 49, 90 S.Ct. 1975. Acting upon an

unsubstantiated police bulletin received over the radio, the troopers could reasonably have believed the issuer of such information had sufficient probable cause to justify their stopping and searching the van immediately before it could be removed from the locality. In truth, the dispatcher may not have had valid probable cause to warrant the arrest of the defendants, or perhaps even the search of the van, but that in no way renders such arrest and search flagrant or wanton. And the Supreme Court has held that it sees no difference, for constitutional purposes, "between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers,* at 52, 90 S.Ct. at 1981. Even without actual probable cause to search, either procedure is reasonable if at the time of the search the police could reasonably have presumed the dispatcher to have sufficient probable cause to search the fleeting target.

The Common Pleas Court observed that coercion depends not only upon what was done by the troopers, but also upon the effect the troopers' actions had upon the consenting party. By reason of the fact that the defendants demanded to know why they had been stopped before they would acknowledge the Miranda warnings, and in light of their conduct during the search itself, it appears that not only is any contention of submission or acquiescence to flagrant official conduct dispelled, but also that such conduct on the part of the petitioners constitutes an intervening cause for consent so unrelated to the initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest. As Judge Speath concluded in his concurring opinion to the decision of the Superior Court

of Pennsylvania affirming the Court of Common Pleas:

> "Accepting the troopers' testimony, it appears that appellants were specifically told they did not have to consent. Further, the troopers took the unusual precaution of obtaining appellants' written consent. And finally, the manner in which appellants conducted themselves manifests a hardboiled bravado, which, on balance, persuades me that although most persons would have found the circumstances too threatening to permit of voluntary consent, appellants did not." *Commonwealth v. Richard and Santos,* 983–984 October Term 1974.

Therefore, we conclude that the conduct of the troopers during the stopping of the defendants and the search of the van was not wanton or flagrant. We further find that a voluntary and uncoerced act of consent intervened between the illegality of the arrest and the subsequent consent, and thereby dissipated any taint.

■ The defendants emphasize the temporal proximity of the initial illegal arrest to the procurement of the consent, pointing out that the consent to search was obtained within the space of nine or ten minutes. While the temporal proximity is admittedly a factor which should be considered, and in fact was not expressly considered in the opinions rendered by the Superior Court of Pennsylvania or the Common Pleas Court, we conclude that other factors preponderate to indicate the intervention of a voluntary act of consent within that short lapse of time. In recognizing the relevance of this factor, Judge Tuttle, in his opinion in *Collins v. Beto,* 348 F.2d 823, 828 (5th Cir. 1965), qualified the weight to be accorded to it by also emphasizing that the mere passage

of time could not serve to dissipate the taint, otherwise ". . . the police would be free simply to keep a suspect 'on ice' for a day or two before beginning an interrogation. . . ."

■ We also reject the contention proferred by counsel for defendant Richard that the written consent obtained from Richard was vitiated by fraudulent misrepresentations on the part of the troopers. Specifically, counsel contends the signing was the result of a representation by the troopers to the effect that the purpose of signing the paper was to "release" the officers from any possible consequences of the search. Trooper Geary's precise testimony, however, was that the police would not search the vehicle based on defendants' oral consent alone, but rather they would require written permission to protect the troopers from any recourse if something would be stolen or anything of that nature. Thereafter, the defendants were again cautioned that they did not have to give the troopers permission to search the van. The written permission slip which was signed by both defendants further indicates the clear consent purpose of the signing: "I give my permission to Tpr. Robert C. Geary and Tpr. Max Seiler to search my veh. . . ." We find that Richard's consent was clear and unequivocal, and not induced by any misrepresentations on the part of the troopers.

■ The final contention of counsel for defendant Richard is that his (Richard's) statement, "It's mine," spoken while enroute to the district magistrate's office for arraignment, should have been excluded from the testimony pursuant to a written agreement with the court to exclude such statements.[9] The record is devoid of any

---

9. Counsel also argues that testimony of the troopers establishing that the incriminating

statement was made by defendant Richard at that time materially changed between the

such agreement or statement, and as a consequence there is no basis by which to determine the content or terms of such agreement. Further, the record indicates that the statement, "It's mine," was not in response to any questioning by the troopers. A question had been directed to defendants Santos by Trooper Geary concerning the source of the marijuana and defendant Richard's statement was a spontaneously volunteered admission following Santos' denial of ownership. Under the circumstances, this does not appear to be a situation where the police conduct was "expected to, or likely to, evoke admissions." *Commonwealth v. Simala*, 434 Pa. 219, 226, 252 A.2d 575, 578 (1969). What followed did, however, constitute improper questioning in light of the signed waiver forms which had been crossed out in part so as to indicate that the defendants were not willing to answer questions and desired to speak with an attorney first. As Trooper Geary testified, he undertook "informal, inquisitive type questioning" in order to obtain further information following defendant Richard's apparent openness to talk. Therefore, subsequent responses by the defendants to questions asked by the troopers were properly excluded as the product of improper custodial interrogation.

Accordingly, an appropriate order will be entered.

### ORDER

And now, this 16th day of September 1975, it is ordered that for the reasons set down in the memorandum filed this date, the applications of Theodore James Santos, Jr. and Paul Richard, a/k/a Richard Anthony Harris, for writs of habeas corpus be and are hereby denied.

suppression hearing and the trial. Trooper Geary specifically attributed the statement, "It's mine," to defendant Richard at both the suppression hearing and the trial. Whereas, Trooper Seiler indicated at the suppression hearing that the statement was made by "someone in the back seat;" it appears that his more specific testimony at the trial may have been prompted or recalled by Trooper Geary's prior testimony at the suppression hearing.