Commonwealth *v.* Ruckinger, Appellant.

Submitted September 8, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*John Woodcock, Jr.,* Public Defender, for appellant.

*William J. Haberstroh,* Assistant District Attorney, and *Amos C. Davis,* District Attorney, for Commonwealth, appellee.

OPINION BY HOFFMAN, J., March 29, 1976:

Appellant contends that the evidence derived from information gained during his illegal arrest was the "fruit" of his illegal detention and, therefore, should have been inadmissible at his trial.

On March 20, 1974, the appellant and a companion were driving slowly in appellant's automobile through a commercial area of Lock Haven, Altoona. Detective Sergeant Eichenlaub of the Lock Haven Police Force noticed the appellant's automobile and began to follow it on a parallel street. When Officer Eichenlaub lost sight of the car, he drove to the street where appellant had been traveling and found appellant's vehicle unoccupied. He then commenced a search for the occupants of the car. About a block from the car, the officer noticed the appellant walking down the street in a normal manner. He stopped the appellant, who fully identified himself and answered all questions. During the questioning, Officer Eichenlaub received a radio call that an individual with a firearm had been apprehended in the vicinity. At this time, Officer Eichenlaub did not know whether the individual with the firearm had been in appellant's automobile, or whether that individual had committed any crime in concert with the appellant. Nevertheless, the appellant was taken into custody and placed under arrest.

The appellant was taken to Lock Haven Police headquarters, where he underwent interrogation for one and one-half hours. In the presence of an officer, the appellant was then permitted to place a telephone call to his father. During the call, appellant told his father to "get rid of the stuff" or to "take care of his things."[1] The officer overheard the telephone conversation, and as a

---

1. There was some dispute over the appellant's exact words. The officer who overheard the conversation testified that the appellant had stated "get rid of the stuff." Appellant's father, on the other hand, testified that his son had said "take care of my things."

result, a police unit was dispatched to appellant's father's home. As the police unit arrived at the residence, appellant's father was driving away. The police stopped his car on the highway, and with his consent, searched the automobile. The search revealed several guns which subsequently proved to be stolen.

Appellant was charged with burglary and receiving stolen goods. On September 16, the appellant filed a motion to suppress evidence, which was denied by the lower court. At appellant's trial on January 29, 1975, the lower court granted appellant's demurrer to the charge of burglary but he was found guilty of receiving stolen goods. Appellant's oral post-trial motions, made immediately after trial, were denied. Appellant was sentenced to three to ten years imprisonment; this appeal followed.

Because appellant's oral post-trial motions were made after the effective date of *Commonwealth v. Blair*, 460 Pa. 31, 331 A. 2d 213 (1975), we must determine whether appellant has preserved his arguments for appeal. In *Commonwealth v. Blair*, supra at 33 n.1, 331 A. 2d at 214 n.1, our Supreme Court stated: "[T]he Pennsylvania Rules of Criminal Procedure, Rule 1123 (a), 19 P.S. Appendix, requires written post-trial motions. The practice in some judicial districts of ignoring the requirements of Rule 1123(a) is condemned. Henceforth, issues not presented in compliance with the rule will not be considered by our trial and appellate courts." In *Commonwealth v. Irwin*, 460 Pa. 296, 299, n.3, 333 A. 2d 735, 737, n.3 (1975), our Supreme Court urged "the courts and counsel to adhere to Rule 1123, Pa.R.Crim.P., 19 P.S. Appendix."

Rule 1123(a) provides: "Within seven (7) days after a finding of guilt, the defendant shall have the right to file written motions for a new trial and in arrest of judgment ...." Rule 1123(b) on the other hand, provides: "If the defendant agrees on the record, the post-verdict motions may be made orally *at the conclusion of the trial ....*"

(Emphasis supplied). In *Commonwealth v. Blair*, supra, the Court apparently condemned the practice in some judicial districts of making oral post-trial motions at a time other than the conclusion of trial. Since appellant's post-trial motions were made at the conclusion of trial in accordance with Rule 1123(b), the issues raised are properly before us.

The lower court found, and the Commonwealth now admits, that the appellant's arrest was illegal. The lower court held, however, that the telephone conversation was sufficiently an act of free will so as to break the nexus between the illegal arrest and the seizure of the guns.

In *Commonwealth v. Whitaker*, 461 Pa. 407, 413, 336 A. 2d 603, 606 (1975), our Supreme Court noted that in "virtually all of the 'fruit of the poisonous tree' cases which this Court has considered, there have existed only two links in the alleged causal chain, i.e., the initial illegality and the challenged physical or verbal evidence resulting therefrom." In the present case, however, there are three links: the initial illegal arrest, appellant's statement on the telephone while under arrest, and the stolen property recovered as a direct result of the statement. We are faced, therefore, with a situation in which the evidence sought to be introduced is derived from information gained during the illegal arrest. This third link, however, does not alter the applicable standards: "what is of critical importance for constitutional purposes is that there exists a real and direct causal connection between appellant's unlawful arrest [and the evidence derived therefrom]." *Commonwealth v. Whitaker*, supra at 413, 336 A. 2d at 606. See also, 43 A.L.R. 3d 385.

The seminal case embodying the "fruits of the poisonous tree" doctrine is *Wong Sun v. United States*, 371 U.S. 471 (1963). There, the Supreme Court announced the principles to be applied in determining whether evidence procured after an illegal arrest should be excluded: "We need not hold that all evidence is 'fruit

of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " See also *Commonwealth v. Whitaker*, supra; *Commonwealth v. Richards*, 458 Pa. 455, 327 A. 2d 63 (1974); *Betrand Appeal*, 451 Pa. 381, 303 A. 2d 486 (1973); *Commonwealth v. Garvin*, 448 Pa. 258, 293 A. 2d 33 (1972); *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972); *Commonwealth v. Bishop*, 425 Pa. 175, 228 A. 2d 661 (1967). Once it is determined that the evidence was obtained by exploiting the illegality, the exclusionary rule applies.[2] Our Supreme Court has often stated that the challenged evidence may be purged of the primary taint only if the Commonwealth proves that it results from an intervening act of free will or if the connection between the arrest and the illegality has become so attenuated as to dissipate the taint. See, e.g., *Commonwealth v. Richards*, supra; *Betrand Appeal*, supra.

---

2. The United States Supreme Court in *Mapp v. Ohio*, 367 U.S. 643, 656 (1961) extensively discussed the rationale of the exclusionary rule: " [T]he purpose of the exclusionary rule 'is to deter — to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.' *Elkins v. United States*, supra, 364 U.S. at page 217, 80 S. Ct. at page 1444." Further citing *Elkins v. United States*, supra, the Supreme Court in *Mapp v. Ohio*, supra at 659 stated: "[T]here is another consideration .— the imperative of judicial integrity ... The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, ... its own existence. As Mr. Justice BRANDEIS, dissenting, said in *Olmstead v. United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 575, 72 L.Ed. 944 (1928): 'Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example ... If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.' "

While the "free will" rationale has been applied most often to confessions obtained during an illegal arrest, see e.g., *Commonwealth v. Jackson*, 459 Pa. 669, 331 A.2d 189 (1975); *Betrand Appeal*, supra; *Commonwealth v. Bishop*, supra; it is equally applicable to other statements made during an illegal arrest. See *Wong Sun v. United States*, supra. In *Betrand Appeal*, supra at 389, 303 A. 2d at 490, our Supreme Court, quoting *Commonwealth ex rel. Craig v. Maroney*, 348 F. 2d 22, 29 (3d Cir. 1965), cert. denied, 384 U.S. 1019 (1966), noted two significant factors in determining the causal relationship between an illegal arrest and subsequent confession: "(a) the proximity of an initial illegal custodial act to the procurement of the confession; and (b) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest." Cf., *Commonwealth v. Jackson*, supra at 676 n.6, 331 A. 2d at 192 n.6. In *Commonwealth v. Bishop*, supra at 183, 228 A. 2d at 666, th  Court said that "[b]y 'sufficiently an act of free will'       an not only was the confession truly voluntary, but aᵢₒⱼ free of any element of coerciveness due to the unlawful arrest." Neither *Miranda* warnings alone,[3] nor lapse of time in itself,[4] dissipates the taint.

3. The Court in *Betrand Appeal*, supra at 391-392, 303 A. 2d at 491, stated that " 'such a ... [result] would practically eviscerate the prophylactic effect of the exclusionary rule. Moreover, if a mere showing that a confession during a period of unlawful detention was "voluntary" were sufficient to establish its admissibility, Wong Sun would be an empty promise ...' " The United States Supreme Court in *Brown v. Illinois*, infra, noted that if *Miranda* warnings alone were held to attenuate the taint, arrests made without probable cause would be encouraged by the knowledge that evidence derived therefrom might be made admissible at trial by the simple expedient of giving *Miranda* warnings.

4. In *Commonwealth v. Jackson*, supra, the Court noted that if

In the recent case of *Brown v. Illinois*, 422 U.S. 590, 17 Crim.L.Rep. 3145 (1975), the United States Supreme Court adopted the *Bishop* standards. After noting that the Fourth and Fifth Amendments are in "intimate relation" in that a violation of either compels a person to yield evidence against his will, the Court held that the exclusionary rule was used in *Wong Sun* to protect Fourth Amendment freedoms: "To the extent that the question whether Toy's statement was voluntary was considered, it was only to judge whether it 'was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion.' .... Thus, even if the statement in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requries not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' 371 U.S. at 486. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment." *Brown v. Illinois*, supra at 3148-3149. The Court then suggested several factors relevant to determining whether the taint had been purged: whether *Miranda* warnings have been given, the temporal proximity of the arrest and the statement, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct.

By emphasizing the nature of the official misconduct, the Court held that the point at which the taint will

---

lapse of time in and of itself were enough, the Commonwealth could indiscriminately arrest an individual, wait a set time, and then interrogate him certain that any voluntary confession would be admissible.

dissipate is directly dependent on the nature of the taint (official misconduct) itself.[5] The concurring opinion of Mr. Justice POWELL, discusses in depth the nature of this relationship. Justice POWELL notes that the notion of "dissipation of taint" is an attempt to define the point at which the "detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost" on the legitimate demands of law enforcement. *Brown v. Illinois,* supra at 3151. According to Justice POWELL, the more flagrant the constitutional violation, the more stringent the burden of proof of attenuation: "If, for example, the factors relied on by the police in determining to make the arrest were so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or if the evidence clearly suggested that the arrest was effectuated as a pretext for collateral objectives ... I thus would require some demonstrably effective break in the chain of events leading from the illegal arrest to the statement ... before the taint can be deemed removed." *Brown v. Illinois,* id. In such cases the dual purposes of the exclusionary rule, deterrence and judicial integrity, are best served by excluding the evidence.

In the instant case, it is inconceivable that the arresting officer believed that he had probable cause to arrest. Officer Eichenlaub had been following an automobile for some time on a parallel street. After he lost sight of it, he went to the street on which the automobile was traveling and found the automobile parked and unoccupied. At the time he began his search, all the Officer knew was that there had been two occupants of the automobile. Appellant had been walking at a normal pace when he was stopped, and he

---

5. See A.L.I. Model Code of Pre-Arraignment Procedure, Art. 150, at 46 *et seq.* and Commentary thereon, at 375 *et seq.* (Proposed Official Draft, 1975).

cooperated fully. As soon as Officer Eichenlaub received a radio call that another individual had been stopped nearby with a firearm, appellant was placed under arrest. At this point the officer had no knowledge that the individual was in any way connected with the appellant or whether any crime had been committed by the pair. Thus the arresting officer knew or should have known that the arrest was without probable cause and unconstitutional. See *Commonwealth v. Berrios*, 437 Pa. 338, 263 A. 2d 342 (1970); *Commonwealth v. Hicks*, 434 Pa. 153, 253 A. 2d 276 (1969). Under these circumstances, the exclusionary rule's two purposes of deterrence and judicial integrity require the exclusion of the fruits of such misconduct unless the Commonwealth demonstrates an effective break in the chain.

While the Commonwealth asserts that the appellant voluntarily and freely made the statement in front of an officer who incidently overheard it, appellant's conduct during interrogation refutes that argument.[6] During his interrogation, the appellant steadfastly refused to confess to the burglary. While it is true that the appellant "voluntarily" made the telephone call, he did not "voluntarily" and freely disclose its contents. Furthermore, appellant's telephone call was placed a very short time (one and one-half hours) after his initial illegal arrest. The Commonwealth, therefore, has failed to demonstrate that the statement was "sufficiently an act of free will so as to purge the primary taint." Thus, the statement is inadmissible.

We must now consider whether the guns must be excluded as well. In *Wong Sun*, the Supreme Court was faced with a similar situation. The Court has determined

---

6. While the Commonwealth asserts that the officer incidently overheard the telephone conversation, it is more likely that the officer purposely listened to it. The officer was not only able to repeat appellant's telephone conversation, but was also able to repeat the telephone number that appellant placed his collect call to.

that Toy's statement concerning Yee's possession of narcotics was inadmissible as the fruit of the illegal arrest. The Court then had to consider whether the exclusion of the statement required the exclusion of the narcotics found in Yee's apartment. The Court held that it is "clear that the narcotics were 'come at by the exploitation of that illegality' " and hence inadmissible. The same is true in the instant case: It is clear that the guns were come at by an exploitation of the illegal arrest.

Judgment of sentence is reversed and case remanded for new trial.

DISSENTING OPINION BY PRICE, J.:

In *Wong Sun v. United States*, 371 U.S. 471 (1963), the Supreme Court of the United States defined and articulated the principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest or search should be excluded. The fact situation there presented and the differences in the circumstances of Toy's declarations versus Wong Sun's declarations have become classic. Unfortunately, even though there defined and articulated, *Wong Sun* has not removed the area of dispute and disagreement in the application of those principles. Indeed, the case of *Brown v. Illinois*, 422 U.S. 590 (1975), quoted extensively by the majority, is just another illustration of the difficulty in the application of those principles in this area of our law, and while some light is shed upon our problem as posed in this appeal, the answer, to me, is not so clear as may be suggested by the majority opinion.

While the majority discusses *Brown, supra*, at length, it seems to me that in spite of this discussion in point of fact the majority adopts the "but for" test. Mr. Justice BLACKMUN, speaking for the majority in *Brown*, said:

"While we therefore reject the *per se* rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative *per se* or 'but for' rule." 422 U.S. at 603.

Mr. Justice POWELL, joined by Mr. Justice REHNQUIST, in his concurring opinion sets forth the extremes of the rule of exclusion and then makes this observation: "Between these extremes lies a wide range of situations that defy ready categorization, and I will not attempt to embellish on the factors set forth in the Court's opinion other than to emphasize that the *Wong Sun* inquiry always should be conducted with the deterrent purpose of the Fourth Amendment exclusionary rule sharply in focus. See A.L.I. Model Code of Pre-Arraignment Procedure, Art. 150, p. 54 *et seq.* and Commentary thereon, p. 375 *et seq.* (Prop. Off. Draft 1975). And, in view of the inevitably fact-specific nature of the inquiry, we must place primary reliance on the 'learning, good sense, fairness, and courage' of judges who must make the determination in the first instance. *Nardone v. United States*, 308 U.S. 338, 342 (1939). See *ante*, at 604 n.10." 422 U.S. at 612.

In reviewing this case it appears to me that the facts presented and discussed by the lower court place it in that wide range of situations that "defy ready categorization" discussed by Mr. Justice POWELL and it is here that my assessment differs from that of the majority and hence this dissent.

There can be, and is, no argument advanced concerning this arrest. It was unlawful and was clearly, and properly, held to be so by the lower court. However, it should be noted that all illegal arrests are not *per se* flagrant abuses of police initiative. The lower court judge observed and found that the information at issue, that is, the content of appellant's call to his father, was publicly conveyed and open to public hearing. The officer overhearing the information did not engage in any undercover or underhanded conduct in overhearing the conversation. There was nothing illegal about the method employed, such as electronic eavesdropping, to hear this conversation. The appellant made no objection. The information came to the officer through normal observation and hearing. The majority notes that it is more

likely that the officer purposely listened to the telephone conversation and rejects the argument that the officer incidentally overheard it. Albeit an illegal arrest, appellant was in custody and the officer was present; therefore, whether the officer purposely or incidentally overheard does not, to me, help in the placing of this case in any clearer posture. I am much more impressed with the lower court's finding that the officer's conduct was not truly intrusive and that the information came to him through normal observation and hearing. Also, the lower court found that the information was voluntarily revealed.

It seems also that there are elements to the arrest itself that, while still illegal, offer extenuating circumstances that justify the conclusion that this case is in that category of cases where there was some indicia of probable cause and that the arrest was not effectuated as a pretext for collateral purposes. First, the Lock Haven police in Clinton County were certainly not seeking appellant for the Mason burglaries in Blair County, and it is doubtful that they were even aware of the crime on which appellant now stands convicted at the time of the arrest. It is therefore clear to me that the arrest was not an official subterfuge to the seeking of evidence as to this crime. The argument, of course, is double-edged, and the other side may well be that, absent specific probable cause, the arrest must be the proverbial fishing expedition. The answer to that lies in the consideration of the situation, accurately detailed by the majority, surrounding the arrest.

The time was 12:50 a.m. in a commercial area of Lock Haven. Appellant was in an automobile traveling at a slow rate of speed. While Lock Haven is a fine community, its downtown area, unlike Philadelphia and other larger cities, does not bustle and hustle at that hour of the morning. The operation of this car came, rightfully so, under the watchful eye of an alert Lock Haven policeman. Further erratic action by the stopping,

parking and vacating of the car in this area of the city prompted this officer to check further and search the area for the occupants of the car. He came upon appellant who cooperated fully with the officer.[1] Immediately thereafter, the officer received information about a second man in the area who had been apprehended with a firearm, and knowing that there had been others in the car with appellant, placed appellant in custody.

This is not, to my view, the type of police conduct that can be characterized as a flagrantly abusive violation of Fourth Amendment rights and thus does not call into use the deterrent purpose of the exclusionary rule. The police action was not "willful" nor "negligent" as I would apply those terms. In high crime areas of our larger cities we have approved police action that has less supportive facts than those we now face. To condemn this police conduct in a low crime area of a smaller town where presence in a relatively deserted commercial area of the city can raise even graver doubts in the minds of those charged with society's protection does violence to the spirit and concept of *Wong Sun* and *Brown*.

Appellant's telephone call was sufficient attenuating occurrence to dissipate the taint and I would, therefore, affirm the judgment of sentence.

WATKINS, P.J., and VAN DER VOORT, J., join in this dissenting opinion.

---

1. Indeed appellant cooperated fully throughout the period of the illegal arrest. Although he stoutly denied any wrongdoing, this attitude was maintained throughout the hour or so of his interrogation, and is reflected in the openness of his telephone call.