J-S29029-21

2021 PA Super 253

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:           PENNSYLVANIA
          Appellant         :
:
           v.              :
:
KEVIN JACKSON             :   No. 560 EDA 2021

Appeal from the Order Entered February 11, 2021,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s):  CP-51-CR-0000888-2020.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY KUNSELMAN, J.:           **FILED DECEMBER 21, 2021**

The Commonwealth appeals from the order granting Kevin Jackson's motion to suppress evidence that he abandoned while fleeing from an officer in Philadelphia.[1]  Because the officer reasonably suspected Mr. Jackson was involved in a recent shooting, his command for Mr. Jackson to halt was a legal request so he could further investigate.  As such, we vacate and remand.

Facing various firearm and related offenses,[2] Mr. Jackson moved to suppress the Commonwealth's evidence.  After a hearing on that motion, the suppression court announced its factual findings and legal conclusions from the bench, as follows:

---

[*] Former Justice specially assigned to the Superior Court.

[1] The Commonwealth took this interlocutory appeal pursuant to its certification under Pa.R.A.P. 311(d) that the suppression court's ruling substantially handicaps it prosecution.

[2] **See** 18 Pa.C.S.A. §§ 907(a), 2705, 6106(a)(1), and 6108.

On December 10, 2019, at approximately 7:16 p.m., on or about the 4900 block of Penn Street, Officer Swinarski was on routine patrol in a marked vehicle at which time he heard two to four gunshots in a northern direction from his position. In his officer vehicle, he made his way to the location where he believed the shots had been fired by traveling northbound on Penn Street and then turning westbound onto Harrison. At that point, he encountered the Defendant, Mr. Jackson.

He saw Mr. Jackson running eastbound down Harrison on the sidewalk. [Exiting his cruiser,] the officer then asked [Mr. Jackson] why he was running, and [he] responded, "Because I heard gunshots."[3] And [Mr. Jackson] continued running. At which point, the officer commanded [him] to stop.

Mr. Jackson did not stop as commanded by the officer. He kept running, [and] the officer chased Mr. Jackson. During the course of the chase, Mr. Jackson disposed of some items, which were later recovered and deemed to be a cell phone and a gun as pictured in C-1. [After Mr. Jackson] disposed of the items, the officer [caught] up and detained him with the use of handcuffs and then conducted a search.

[T]he point at which the officer detained [Mr. Jackson] was after [Mr. Jackson] explained his reasons for running and he proceeded to run. At that point, the officer issued a command for Mr. Jackson to stop. And that would trigger the investigatory-detention standard, which requires that [the officer] needed to have a reasonable basis to issue that command to order Mr. Jackson to stop.

I find that on these facts, [the officer] did not have reasonable suspicion to detain Mr. Jackson. I do not find that this was a high-crime area. I don't believe evidence was on the record to support that determination. All we have here is an individual on the street, engaging in running . . . with good reason, because there had been shots fired.

---

[3] This is incorrect. The officer actually testified that Mr. Jackson said he "was running *from* the gunshots." N.T., 2/11/21, at 17 (emphasis added). Mr. Jackson did not call any witnesses to refute the officer's version of events.

The officer made every indication that, at that point, he had not seen [Mr. Jackson] engaging in any criminal activity or have any reason to suggest that [Mr. Jackson] had engaged in criminal activity, nor did the officer, at that point, witness [him] holding any objects or trying to hide any objects. He had no reasonable suspicion to detain Mr. Jackson.

N.T., 2/11/21, at 50-53.

Therefore, the suppression court held that all of the seized evidence was fruit of an unconstitutional *Terry* stop and granted Mr. Jackson full relief. The Commonwealth timely appealed.

It asks whether the suppression court erred "in suppressing a gun and cellphone [Mr. Jackson] discarded as he ran from the area where gunshots had just been fired?" Commonwealth's Brief at 4. The Commonwealth argues the officer had a reasonable (and, thus, constitutional) basis to detain Mr. Jackson when he ordered him to stop.

When reviewing an order granting suppression, our scope of review only includes "the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted." *Commonwealth v. Lindblom*, 854 A.2d 604, 606 (Pa. Super. 2004). Where, as here, police invaded the privacy of an individual without a warrant, we review whether they possessed reasonable suspicion or probable cause *de novo*. *See Ornelas v. United States*, 517 U.S. 690 (1996).

The suppression court found that, when the officer ordered Mr. Jackson to stop, the officer commenced an investigative detention, commonly known

as a **Terry** stop. Consistent with the Fourth Amendment to the Constitution of the United States, police may initiate a **Terry** stop based upon reasonable suspicion that the seized individual is involved in criminal activity. **See Terry v. Ohio**, 392 U.S. 1, 30 (1968). "Pennsylvania courts have consistently followed **Terry** in stop and frisk cases, including those in which the appellants allege protections pursuant to Article I, § 8 of the Pennsylvania Constitution." **In re D.M.**, 781 A.2d 1161, 1163 (Pa. 2001); **see also Commonwealth v. Jefferson**, 853 A.2d 404 (Pa. Super. 2004) (accord). Thus, Article I, § 8 provides citizens no greater protections from **Terry** stops than the Fourth Amendment.

"In order to determine whether the police had a reasonable suspicion [when they executed a **Terry** stop], the totality of the circumstances — the whole picture — must be considered." **D.M.**, **supra**, *citing* **United States v. Cortez**, 449 U.S. 411, 417 (1981). "Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." **Id.** at 417–18. "[I]n determining whether the officer acted reasonably . . . due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." **Terry**, 392 U.S. at 27.

Here, a uniformed officer heard gunshots and drove his marked car towards the location where he thought the shooting had occurred. Shortly thereafter, Mr. Jackson sprinted in the officer's direction, *i.e.*, away from the

suspected location of the shooting. Mr. Jackson was the only person on the street during that December night. This piqued the officer's curiosity that Mr. Jackson might have some tie to the gunshots. Thus, he exited his cruiser and followed up on his hunch by asking Mr. Jackson "what he was running from." N.T., 2/11/21, at 17. This is precisely the type of continued investigation that the Fourth Amendment demands police undertake *before* detaining someone.

This Court has held that an officer may direct a fleeing individual to stop for questioning if the officer reasonably deduces that the individual is potentially "a perpetrator, victim, or eyewitness of a possible shooting." *Commonwealth v. Bryant*, 866 A.2d 1143, 1147 (Pa. Super. 2005), *appeal denied,* 876 A.2d 392 (Pa. 2005). As in the case at bar, the *Bryant* Court addressed a scenario where an officer did not personally observe a suspected, recent shooting. This Court held that the totality of the circumstances (being in a high-crime area, the police officer hearing gunshots and seeing three men running from the area where he believed the gunshots originated) justified a *Terry* stop.

Mr. Jackson contends that any comparison to *Bryant* is inapt, because, unlike *Bryant*, the suppression court found that the Commonwealth did not prove Mr. Jackson was in a high-crime area. He additionally emphasizes that, in *Bryant*, the defendants were the only people fleeing on a crowded street, whereas he was the lone person seen on the night in question.

Here, the officer explained that, prior to directing Mr. Jackson to halt, he inferred from the totality of the circumstances that Mr. Jackson "could be

the victim, the witness, or possibly an offender at that time." N.T., 2/11/21, at 27. This real-time assessment of a highly dangerous, rapidly developing situation was well reasoned, and it comports with **Bryant**.

Where an individual who admits to law enforcement that he is fleeing from gunshots and is the lone person who may have more information or connection to the shooting, this creates reasonable suspicion for the police to stop him and further investigate. In this instance, the officer's inference that Mr. Jackson was probably connected to the active-shooter event was quite reasonable, regardless of the neighborhood where these events unfolded. Thus, the Commonwealth's failure to establish the high-crime-area factor is irrelevant.[4]

_____

[4] For criticism that the high-crime-area factor is an illogical restriction on the powers of police in low-crime areas see **Commonwealth v. Ruckinger**, 362 A.2d 317, 324 (Pa. Super. 1976) (*en banc*) (Price, J. dissenting). **But see also, Commonwealth v. Barr**, 240 A.3d 1263, 1291 (Pa. Super. 2020) (Strassburger, J. concurring), *appeal granted*, 252 A.3d 1086 (Pa. 2021) (criticizing high-crime-area factor for depriving citizens of equal protections of the constitution; "People who live in poor areas that are riddled with crime do not have fewer constitutional rights than people who have the means to live in 'nice' neighborhoods."); **and see** Grunwald & Fagan, *The End of Intuition-Based High-Crime Areas*, CALIFORNIA LAW REVIEW, VOL. 107 at 345, 351 (2019) (compiling data from New York City police officers' search-and-seizure reports, between 2007 and 2012; finding that **Illinois v. Wardlow**, 528 U.S. 119 (2000), rests upon false assumptions about policing — *i.e.*, **Wardlow** assumed that (1) police would only apply the high-crime-area factor to specific blocks or areas of their jurisdictions (NYPD uses the factor throughout the entire City); (2) police would accurately describe areas as high-crime (NYPD invokes the high-crime factor with no statistical relation to a location's actual crime rates); and (3) police would neutrally apply the factor to all searches and seizures (NYPD most often invokes the high-crime-area factor against "young, Black, male suspects," no matter where a **Terry** stop occurs).

In sum, the suppression court erroneously held that the officer initiated an unconstitutional **Terry** stop when he directed Mr. Jackson to stop running so that he could further investigate.  Therefore, we vacate the order of suppression and remand for the suppression court to determine, in the first instance, whether the officer's actions following the lawful **Terry** stop were also constitutional.

Order vacated.  Case remanded for further proceedings consistent with this Opinion.

Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/21/2021</u>