**[J-7-2023] [OISA: Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 24 EAP 2022 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on |
| | : | December 21, 2021 at No. 560 EDA |
| v. | : | 2021 (reargument denied February |
| | : | 16, 2022) vacating and remanding |
| | : | the Order entered on February 11, |
| KEVIN JACKSON, | : | 2021 in the Court of Common Pleas, |
| | : | Philadelphia County, Criminal |
| Appellant | : | Division at No. CP-51-CR-0000888- |
| | : | 2020. |
| | : | |
| | : | ARGUED: March 8, 2023 |

**OPINION IN SUPPORT OF REVERSAL**

**JUSTICE DOUGHERTY**            **DECIDED: September 28, 2023**

The reasonable suspicion standard is not especially demanding, but it isn't toothless either. In my view, Officer Swinarski lacked even reasonable suspicion when he ordered Jackson to stop.[1] Accordingly, I respectfully dissent.

---

[1] Under the Fourth Amendment to the United States Constitution, a police order to stop must actually be obeyed by the person to constitute a seizure. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment."); *California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' . . . does not remotely apply, . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure."). Jackson did not obey Officer Swinarski's order to stop, but instead fled from the officer. *See* N.T. 2/11/21 at 17, 21. Nevertheless, under our state counterpart to the Fourth Amendment, Article I, Section 8 of the Pennsylvania Constitution, a police order to stop effectuates a seizure. In *Commonwealth v. Matos*, 672 A.2d 769 (Pa. 1996), this Court "reject[ed] *Hodari D.* as incompatible with the privacy rights guaranteed to the citizens of this Commonwealth under Article I, Section 8 of the Pennsylvania Constitution." *Matos,*
(continued…)

The "general rule" is that a police seizure of an individual is constitutional "only if based on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (quotation marks and citation omitted).[2] The seminal decision in *Terry*, however, "created an exception to the requirement of probable cause[.]" *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979). Under *Terry*, an officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989), *quoting Terry*, 392 U.S. at 30. The officer must have "a particularized and objective basis for suspecting the

---

672 A.2d at 776. Moreover, *Matos* endorsed *Commonwealth v. Jones*, 378 A.2d 835 (Pa. 1977). *See id.* at 773-74. *Jones*, in turn, noted that "[i]f a citizen approached by a police officer is ordered to stop or is physically restrained, obviously a 'stop' occurs." *Jones*, 378 A.2d at 839. Here, Jackson's suppression motion was premised on both the federal and state constitutions, *see* Omnibus Pretrial Motion to Suppress, 1/7/21 at 1; N.T. 2/11/21 at 13, 43, and the trial court ruled he was seized "under Pennsylvania constitutional principles[,]" *see* N.T. 2/11/21 at 52-53. Additionally, the Commonwealth concedes that when "the officer told [Jackson] to stop [he] thereby 'seized' him for constitutional purposes." Commonwealth's Brief at 11. Under these circumstances, when Officer Swinarski ordered Jackson to stop, he was seized and subject to an investigative stop under Article I, Section 8, triggering the requirement of reasonable suspicion.

[2] While federal and Pennsylvania constitutional law diverge on the question of what constitutes an investigative stop, *see supra* note 1, they are coextensive regarding the quantum and nature of evidence required for a stop, *see Commonwealth v. Grahame*, 7 A.3d 810, 816 (Pa. 2010) ("Pennsylvania courts have always followed [*Terry v. Ohio*, 392 U.S. 1 (1968)] regardless of whether the appellant's claim was predicated on the Fourth Amendment or Article I, Section 8 of the Pennsylvania Constitution."); *In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001) ("Pennsylvania courts have consistently followed *Terry* in stop and frisk cases, including those in which the appellants allege protections pursuant to Article 1, Section 8 of the Pennsylvania Constitution."); *Commonwealth v. Wimbush*, 750 A.2d 807, 810 n.2 (Pa. 2000) ("We note that Pennsylvania has consistently followed Fourth Amendment jurisprudence in stop and frisk cases."); *Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997) ("Pennsylvania has always followed *Terry* in stop and frisk cases[.]").

particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "[A] mere 'hunch' does not create reasonable suspicion[.]" *Kansas v. Glover,* 140 S.Ct. 1183, 1187 (2020), *quoting Navarette v. California*, 572 U.S. 393, 397 (2014). There must be "'some minimal level of objective justification' for making the stop." *Sokolow*, 490 U.S. at 7, *quoting INS v. Delgado*, 466 U.S. 210, 217 (1984). "[T]he level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Glover*, 140 S.Ct. at 1187, *quoting Navarette*, 572 U.S. at 397. In other words, "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy[.]" *Id.* at 1188. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Moreover, "reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette*, 572 U.S. at 403 (2014), *quoting United States v. Arvizu*, 534 U.S. 266, 277 (2002). In assessing the presence of reasonable suspicion, "the totality of the circumstances — the whole picture — must be taken into account." *Cortez*, 449 U.S. at 417. Thus, "the presence of additional facts might dispel reasonable suspicion." *Glover*, 140 S.Ct. at 1191.

Importantly, while *Terry* created an exception to the probable cause requirement, it did not insulate extralegal police conduct from judicial condemnation and the exclusionary rule. On the contrary, *Terry* emphasized:

> Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere. Under our decision, courts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.

*Terry*, 392 U.S. at 15. In particular, the *Terry* Court indicated its concern about stops motivated by racial bias. *See id.* at 14 (noting "[t]he wholesale harassment by certain elements of the police community, of which minority groups, particularly [Blacks], frequently complain"); *id.* at 14 n.11 ("(i)n many communities, field interrogations are a major source of friction between the police and minority groups. . . the friction caused by (m)isuse of field interrogations increases as more police departments adopt aggressive patrol in which officers are encouraged routinely to stop and question persons on the street who are unknown to them, who are suspicious, or whose purpose for being abroad is not readily evident.") (quotation marks and citation omitted).[3]

Here, Officer Swinarski, who was the sole witness at the suppression hearing, testified he was on patrol at the intersection of Penn Street and Oxford Avenue in Philadelphia. Shortly before 8 p.m., the officer heard two to four gunshots west of his location. He drove slowly northbound on Penn Street, and then turned left on to Harrison Street and drove westbound on Harrison. As the officer drove westbound on Harrison, he saw Jackson running eastbound on Harrison towards him. Jackson was running on the sidewalk, and he was the only pedestrian. He was not clutching anything or holding

---

[3] Many courts and commentators since *Terry* have expressed the same concern. *See generally* WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §9.1(e) (6th ed. 2020).

anything. He was not reaching toward his waistband or pockets. He did not appear injured. He did not change direction. Officer Swinarski got out of his patrol car and asked Jackson why he was running. Jackson responded that he was running from the gunshots. At that point, Officer Swinarski ordered him to stop. Jackson, however, disregarded the officer's order and ran. *See* N.T. 2/11/21 at 17-18, 25-27, 29-30, 35-36.

I agree with the Opinion in Support of Affirmance (OISA) that, while not insusceptible to innocent explanation, the sound of multiple gunshots in this case established reasonable suspicion of criminal activity. *See* OISA at 22 n.15. The sound of gunfire in Philadelphia is potentially indicative not only of violent crime and firearms violations, but also violations of the multiple Philadelphia-specific laws concerning the possession and discharge of firearms. *See, e.g.*, 18 Pa.C.S. §6108 (generally prohibiting possession of firearms on public streets or public property in Philadelphia); Phila. Code §10-810(1) ("No person shall fire or discharge recklessly and without reasonable cause any rifle, gun, pistol, or other firearm."); Phila. Code §10-815(1) ("No person shall go upon land owned or controlled by the City or any public authority with a rifle, gun, pistol, or other firearm or with bows and arrows for the purpose of hunting wildlife."); Phila. Code §10-815(2) ("No person while hunting wildlife shall discharge any rifle, gun, pistol or other firearm or arrow into land owned or controlled by the City or any public authority."); Phila. Code §10-818(2) (generally prohibiting possession of firearms on public streets or public property); Phila. Code §10-822(2) (generally prohibiting possession of firearms in educational institutions); Phila. Code §10-833(2) (generally prohibiting possession of firearms in or within 100 feet of elementary or secondary schools); Phila. Code §10-842(2) (generally prohibiting possession of firearms at recreational facilities). Yet, reasonable

suspicion of criminal activity, even serious criminal activity, is alone not sufficient to support an investigative stop. The detaining officer must also have reasonable suspicion "that the particular individual being stopped is engaged in [the] wrongdoing." *Glover*, 140 S.Ct. at 1191, *quoting Cortez*, 449 U.S. at 418. It is with respect to this additionally essential showing that I believe the Commonwealth's evidence falls short. *See In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013) ("It is the Commonwealth's burden to establish that evidence was properly seized[.]").

Considering the totality of the circumstances, the sole circumstance even arguably connecting Jackson to the potential wrongdoing (*i.e.*, the shooting) is the fact, readily admitted by him at the time, that he was running from the gunshots. In and of itself, running from gunshots is not criminal, suspicious, or unusual. Gunfire, of course, carries the risk of serious injury and death. It is a normal and expected human reaction to run from the danger. To be sure, "innocent facts . . . may give the [police] reasonable suspicion." *Interest of T.W.*, 261 A.3d 409, 423 (Pa. 2021) (quotation marks and citation omitted). However, some facts are so susceptible to varying innocent explanations as to carry little if any weight in the calculus. *See United States v. Karam*, 496 F.3d 1157, 1163 (10th Cir. 2007) ("While . . . even seemingly innocent factors may be relevant to the reasonable suspicion determination, some facts are so innocuous and so susceptible to varying interpretations that they carry little or no weight.") (quotation marks and citation omitted). The fact Jackson was running from the gunshots falls into this category. There are many wholly innocent explanations for why Jackson may have been running from the shots. For instance, it is entirely possible he was not at or near the scene of the crime but rather heard the shots from a distance and prudently decided to run for his own safety.

After all, Officer Swinarski was not at or immediately proximate to the location where the shots were fired, yet he heard them and responded accordingly. Jackson could very well have done the same. Alternately, Jackson could have been present at the scene of the gunfire but merely a victim, intended victim, witness, or bystander, who reasonably determined to flee the threat of harm. *See* N.T. 2/11/21 at 17 (Officer Swinarski testifying Jackson could have been victim or "good witness"). It is also conceivable Jackson neither heard nor saw the gunshots but instead was told by someone else that shots had been fired and decided to run. It is possible too that he saw others running, presumed they were fleeing gunfire in a city where shootings are tragically common, and determined to join them. The mere fact Jackson was running from gunshots is simply too amenable to innocent interpretation to support reasonable suspicion he committed the shooting.

This is particularly so given the additional facts dispelling reasonable suspicion for a stop. Upon seeing Jackson running, Officer Swinarski observed Jackson did not have a gun in his hands, did not make any reaching motion indicative of his possession of a gun, did not appear injured in any way, and did not change direction to avoid the officer. *See* N.T. 2/11/21 at 26-27, 35. These exculpatory facts counteract any hunch of criminality arising from Jackson's flight, and solidify the absence of reasonable suspicion in this case.

In support of its contrary conclusion, the OISA argues "Officer Swinarski witnessed Jackson running from the location of gunshots shortly after he heard them[.]" OISA at 25; *see also id.* at 30 ("Jackson was the lone individual running directly from the location of a crime[.]"). However, Jackson never told Officer Swinarski he was running from the **location** of the gunshots, only that he was "running from the gunshots[,]" N.T. 2/11/21 at

17, and the record does not otherwise establish the location of the shooting. The full extent of the evidence as to the location of the gunshots is Officer Swinarski's testimony that when he was at the intersection of Penn Street and Oxford Avenue, he heard gunshots "west of [his] location." *Id*. This vague testimony does not specify a situs for the shooting. To say that something was heard to the "west" encompasses a very broad range indeed, and does not pinpoint the geographic origin of the sound. Put simply, "west" is a direction, not a location. We cannot conclude Jackson was running from the location of the gunshots when this location is itself a mystery. In any case, to the extent Jackson was running from the dangerous scene of a shooting, this conduct is subject to a multiplicity of innocent explanations, too many to move the needle from bare hunch to reasonable suspicion.

The OISA also emphasizes "Jackson was the lone individual running on the street[.]" OISA at 25; *see also id.* at 22 ("Officer Swinarski encountered a *single individual* — Jackson — running from what he believed to be the source of the gunshots.") (emphasis in original); *id.* at 30 (referring to Jackson as "lone individual running"). Although the OISA does not elaborate on the importance of the fact Jackson was alone, its implied argument appears to be that someone must have fired the shots, and if Jackson was the only person in the vicinity, he must have been that someone. Yet the record does not establish Jackson was the only person in the area of the gunshots. Officer Swinarski merely testified Jackson "was the only pedestrian." N.T. 2/11/21 at 25. His testimony allows for other individuals out on the street not traveling by foot, including people in cars, sitting on front steps or porches, and standing on street corners. And he could only credibly testify concerning what he was observing at the time: the particular

block of Harrison Street where he encountered Jackson. There were other blocks and other streets nearby. Officer Swinarski encountered Jackson in a dense section of the Commonwealth's most populous city. It was close to 8 p.m., not the middle of the night or early morning. It is not plausible the officer and Jackson were the only two people out on the street in the area of the gunfire.

The OISA contends "Jackson continued on his way after responding to Officer Swinarski and gave no indication that he sought Officer Swinarski's protection or aid during the interaction leading up to the stop." OISA at 22. In fact, according to Officer Swinarski's testimony, Jackson stopped to answer the officer's question as to why he was running, and took off again only after the officer told him to stop. *See* N.T. 2/11/21 at 21 ("The only communication **prior to him running** was that he stated that he was running from the gunshots.") (emphasis added); *id.* ("At that point, I told him just to stop multiple times as I was approaching. **And then he just took off** on foot.") (emphasis added); *id.* at 25-26 ("Q. And instead of continuing to run and totally disregard you, the young man answers you and tells you why he's running? A. Yes."); *id.* at 30 ("[W]hen I told him to stop, I go around my vehicle to approach him **and he takes off on foot**.") (emphasis added); *but see id.* at 51 (trial court finding "the defendant proceeded to keep — to continue running. At which point the officer commanded the defendant to stop."). In any case, whether Jackson stopped to answer Officer Swinarski's question or not, he had no real opportunity to seek the officer's assistance. As Jackson ran towards the officer but was still approximately eight feet away from him, the officer asked him why he was running. *See id.* at 28. Then, just as soon as Jackson answered he was running from the gunshots, Officer Swinarski immediately commanded him to stop. *See id.* at 17 ("He

stated he was running from the gunshots. **At that point**, I told Mr. Jackson to stop.") (emphasis added); *id.* at 28-29 ("Q. Okay. And what you do, instead of asking him was he infirmed [sic] or shot or one of those questions, you tell him to stop? You give him an official police command to stop, right? A. Yes."). That Jackson did not manage to verbalize a request for aid in the brief instant between when he was preemptively questioned from a distance and then instantaneously ordered to stop is not meaningfully suspicious.

Finally, the OISA's reliance on *State v. Hairston*, 126 N.E.3d 1132 (Ohio 2019), and *Commonwealth v. Bryant*, 866 A.2d 1143 (Pa. Super. 2005), is misplaced. *See* OISA at 22 (finding case to be "akin to *Hairston* and *Bryant*"). First, these cases do not bind this Court. *See Domus, Inc. v. Signature Bldg. Sys. of PA, LLC*, 252 A.3d 628, 637 (Pa. 2021) ("[D]ecisions of our sister states are certainly not binding on this Court[.]"), *quoting Koken v. Reliance Ins. Co.*, 893 A.2d 70, 83 (Pa. 2006); *Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76, 93 (Pa. 2023) ("[I]t is axiomatic that Superior Court decisions . . . do not bind this Court."). They are also distinguishable on their facts. In *Hairston*, the police "knew from personal experience that crime often occurred at night in the area where the stop took place." *Hairston*, 126 N.E.3d at 1136. In addition, "the stop occurred very close in time to the gunshots[.]" *Id.* It took the police "only 30 to 60 seconds to get to the intersection" where they viewed Hairston. *Id.* Further, "Hairston was the only person in the area from which the shots emanated." *Id.* Here, on the other hand, there is no evidence the stop occurred in a high-crime area, and the trial court expressly refused to find that this circumstance was present. *See* N.T. 2/11/21 at 52 ("I do not find that this was a high-crime area. I don't believe evidence was on the record to support that

determination.").[4]  Moreover, the record here is silent as to the amount of time that elapsed between when Officer Swinarski first heard the shots and ultimately encountered Jackson.  Pertinently, the officer testified he drove "slowly" in responding to the gunshots.  *See id.* at 17 ("I proceeded to drive slowly northbound on Penn, approaching Harrison.").  Furthermore, the record does not establish Jackson was somehow the sole person in a congested area of Philadelphia in the early evening, but rather merely that he was the only pedestrian Officer Swinarski observed on the particular block of Harrison Street where the stop occurred.  *See* N.T. 2/11/21 at 25.

The non-binding *Bryant* case is also factually distinct from this one.  In *Bryant*, the stop occurred "in a high-crime area . . . with a high incidence of drug dealing."  *Bryant*, 866 A.2d at 1146-47.  The officer saw Bryant "running around the corner from where [the officer] heard the shots originate."  *Id.* at 1147.  While Bryant was running, "other individuals in the street were not fleeing the area of the gunshots."  *Id.*  Presently, by contrast, the area where Jackson was stopped was not a high-crime area, the originating location of the gunshots is unknown, and Jackson's conduct was not abnormal.  Indeed, Officer Swinarski testified Jackson's running from gunshots was "[a]bsolutely" normal behavior.  N.T. 2/11/21 at 26.

I acknowledge the possibility there was in fact reasonable suspicion for the *Terry* stop here but the thin record of the suppression hearing simply fails to substantiate it.  To

---

[4] The Commonwealth argues that while Officer Swinarski "did not intone the words 'high-crime area," he "testified 'there's been a large increase in gun violence' in the area where the stop occurred[.]"  Commonwealth's Brief at 17, *quoting* N.T. 2/11/21 at 20.  A large increase in gun violence in an area does not make it a high-crime area.  If the number of yearly shootings in an area increases from zero to one, there has been a large (100%) increase in gun violence in the area, but the area may not be fairly characterized as a high-crime area.

the extent this is the case, this problem of proof could potentially have been avoided by a more detailed and fulsome evidentiary presentation by the Commonwealth. *See Interest of T.W.*, 261 A.3d at 438 (Dougherty, J., concurring) (advising testifying police officers in *Terry* cases to "provide as much detail as possible" and advising prosecutors to "be cognizant that specificity is, where available, beneficial both at the motion stage and on appeal"). In any event, our scope of review is, of course, confined to the record actually before us, which, in my view, does not support reasonable suspicion. Hence, I would reverse the Superior Court's order and remand for further proceedings.[5]

---

[5] The Commonwealth argues in the alternative that even if the stop was not permissible under *Terry*, it was lawful under other authorities permitting the police to stop individuals they reasonably believe might be able to assist them in responding to a serious crime. *See* Commonwealth's Brief at 25-36. The Superior Court did not reach this argument in light of its holding there was a "lawful *Terry* stop." *Commonwealth v. Jackson*, 271 A.3d 461, 465 (Pa. Super. 2021). Accordingly, pursuant to our usual practice, I would remand to the Superior Court to consider this unaddressed issue in the first instance. *See Commonwealth v. Koger*, 295 A.3d 699, 711 n.12 (Pa. 2023) (noting Court's "usual practice" with respect to issue not addressed in lower court is to remand for further consideration).